**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASHLEY ALBERT, | |
| Plaintiff, | |
| -against- | Civil Action No. 1:25-cv-3013 |
| JONATHAN SCHNAPP and LAC SERVICES I, INC., as Trustee of the Schnapp Family Business Trust, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

By and through her undersigned counsel, Plaintiff Ashley Albert alleges as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff Ashley Albert and Defendant Jonathan Schnapp are the co-founders of the Royal Palms Shuffleboard Club, a successful business with locations in Brooklyn and Chicago. Each of the two locations serves as a bar, entertainment venue, and shuffleboard club, and each has become an important fixture of its respective local community.

2.      Prior to the events giving rise to this suit, Plaintiff and Defendant were always equal partners and owners of the venture since founding it in 2012.  They operated the venture through an entity called Biscuits & Tangs, LLC (the "Company"), named after the discs on a shuffleboard court (called "biscuits") and the cues used to slide them across the court (called "tangs").  The Company manages and controls the two entities that own the shuffleboard clubs.

3.      The parties' relationship is governed by the Operating Agreement, attached as Exhibit A.  Among other things, the Operating Agreement sets out the parties' rights and responsibilities with respect to the Company, its subsidiaries, and each other, including decisions that require the prior written consent of the other partner ("Major Decisions").

4.      Under the Operating Agreement, should a partner request consent for a Major Decision and the other partner refuse, the requesting partner may invoke the Buy/Sell Provision to resolve the deadlock.  Under that provision, the requesting partner names a price and gives the other partner the option to either buy the requesting partner's half of the business at that price, or sell their own half at that price.  The purpose of this provision is to resolve deadlocks in decision-making while ensuring that the invoking partner sets a fair price, since the other partner may choose to either buy or sell at that price.

5.      Almost from the outset of the venture, Defendant routinely excluded Plaintiff from managerial decisions despite her equal status as a Manager and one-half owner of the Company. Defendant escalated this behavior beginning in approximately the Spring of 2021, when he began a scheme to increase his operational control of the Company and lay the groundwork for his subsequent attempt to acquire the entirety of the business.  Defendant insisted that he handle all of the day-to-day work, demanded total autonomy in making decisions, and unilaterally acted on behalf of the Company without Plaintiff's permission.  Defendant then began campaigning for Plaintiff to give Defendant her half of the Management Fee.  When Plaintiff refused, Defendant attempted to force Plaintiff to sell her half of the business to him at a bargain price by misusing the Buy/Sell Provision.

6.      Defendant manufactured a Major Decision under the Buy/Sell Provision by demanding a one-sided reconfiguration of the Company's economics that was contrary to the parties' longstanding business arrangement and fundamentally unfair to Plaintiff.  Specifically, Defendant demanded that Plaintiff cede to him 100% of the Management Fee earned by the Company under the Operating Agreement, rather than the 50% he was entitled to as a one-half partner.  When Plaintiff unsurprisingly refused to give up the entirety of her Management Fee,

Defendant claimed that her refusal had caused a deadlock as to a Major Decision. He thereby invoked the Buy/Sell provision and offered to either sell his half of the business to Plaintiff for $1,400,000, or to buy Plaintiff's half of the business for that same price. Upon information and belief, Defendant set this low price with the expectation and intention that Plaintiff would be unable to afford to be the purchaser and would thereby be forced to sell him her half of the business at a steep discount.

7. Instead, Plaintiff accepted the offer and agreed to buy Defendant's half of the business at the price he set. Stunned and outraged, Defendant attempted to discredit Plaintiff's acceptance and create obstacles to completing the very deal that he himself had proposed. Defendant went so far as to refuse to provide wire instructions to inhibit Plaintiff from sending him the deposit called for by the Operating Agreement.

8. When it became clear that Plaintiff would indeed be purchasing his half of the business, however, Defendant began to unilaterally take measures to make up for the disappointing price that he set for himself. Without Plaintiff's prior knowledge or consent, Defendant caused hundreds of thousands of dollars to be transferred out of the operating subsidiaries, leaving them with hardly any operating cash, and then made an outsized cash distribution of $375,000 to himself.

9. These distributions all took place after Plaintiff accepted Defendant's offer to sell his half of the business and all of its assets. That post-acceptance asset transfer necessitates a $375,000 adjustment to the purchase price pursuant to the Operating Agreement, which calls for the purchase price to reflect the "price to be paid for *all assets* of the Company," not whatever is left over after Defendant transfers enormous value to himself. Indeed, when Defendant anticipated that he would be the buyer rather than the seller, he made clear that any subsequent distributions to Plaintiff would reduce the payment amount due at Closing, in accordance with these provisions.

Notwithstanding this requirement, Defendant has refused to acknowledge this adjustment to the purchase price and the reduction in the amount due at Closing.

10.    Pursuant to the clear language of the Operating Agreement, the Buy/Sell Provision calls for a simple transaction in which Defendant must transfer his total Interest in the Company to Plaintiff at Closing.  Yet, as Closing neared, Defendant began to make unreasonable demands contemplated nowhere in the Operating Agreement.  He insisted on being released from guarantees on lease agreements with subsidiary entities and being exculpated and indemnified for all manner of potential liabilities, including those pertaining to his own prior misconduct.  None of these conditions are remotely contemplated by the Operating Agreement.  Notwithstanding Defendant's unreasonable demands and continuous efforts to obstruct the Closing, Plaintiff expended significant time and resources negotiating in good faith and attempting to complete the transaction with mutually acceptable transaction documentation.

11.    Mere hours before the parties were supposed to consummate the transaction, however, Defendant's counsel disclosed that Defendant had secretly transferred all of his Interests in the Company to the Schnapp Family Business Trust several weeks earlier.  That undisclosed transfer had dramatic consequences for the documentation, the structure of the transaction, and Defendant's ownership of and managerial rights in the Company.  As a result of that transfer, Defendant ceased to be a Member of the Company.  Upon learning of this transfer and Defendant's loss of his status as a Member, Plaintiff promptly removed Defendant as a Manager pursuant to the Operating Agreement, but Defendant has refused to acknowledge his removal.

12.    On the Closing Date, Defendant defaulted on his obligations and refused to consummate the transaction.  Plaintiff attempted to negotiate in good faith for well over two months following Defendant's default, but Defendant has refused to complete the transaction on

the terms contemplated by the Operating Agreement. Instead, he has insisted on an array of unreasonable, extra-contractual economic and legal demands that would inflict further harm upon Plaintiff. Defendant's refusal to complete the Closing on the agreed-upon terms has forced Plaintiff to file this litigation seeking specific performance of the Closing.

13.    Plaintiff seeks to complete the transaction on the terms provided for in the Operating Agreement, with the payment amount reduced to reflect Defendant's $375,000 unilateral adjustment to the purchase price. Plaintiff also seeks her attorneys' fees, as provided for in the event of a default under the Operating Agreement. She also seeks an order declaring that, following his transfer of Interests to the Schnapp Family Business Trust, Defendant has been removed as a Manager and is no longer a Member of the Company.

## THE PARTIES

14.    Plaintiff Ashley Albert is a resident of California. She co-founded the Company together with Defendant Jonathan Schnapp.

15.    Defendant Jonathan Schnapp is a resident of Brooklyn, New York. Defendant co-founded the Company together with Plaintiff.

16.    Defendant LAC Services I, Inc. ("Trustee") is a New York domestic business corporation that serves as Trustee of the Schnapp Family Business Trust. Trustee is named solely for purposes of providing relief sought herein.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

18.     This Court has personal jurisdiction over Jonathan Schnapp because he is a resident of Brooklyn, New York.  This Court has personal jurisdiction over the Trustee because it is a New York domestic business corporation and materially participated in events within this district by acquiring Defendant's Interest in the Company.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District, and the Company that is the primary subject of the dispute is based in Brooklyn, which is within this District.

## STATEMENT OF FACTS

### I.   Plaintiff and Defendant Create Royal Palms and Enter Into the Operating Agreement

20.     In May 2012, Plaintiff and Defendant formed the Company.  After forming the Company, Plaintiff and Defendant discussed signing an operating agreement for the Company and considered a draft agreement, but did not sign it.  After running the business for several years, Plaintiff and Defendant revisited the issue of signing an operating agreement.  On or about October 22, 2018, Plaintiff and Defendant signed the Operating Agreement.  *See* Exhibit A.[1]  The Operating Agreement has not been amended since its signing and remains in effect.

21.     Pursuant to the Operating Agreement, both Plaintiff and Defendant were Members, Managers, and Managing Members of the Company.

22.     Section 6.1 of the Operating Agreement allows the Managers—Plaintiff and Defendant—to manage the business and affairs of the Company.  That section provides that "[n]o Member other than the Managers shall take any action on behalf of the Company."  Ex. A § 6.1.

---

[1] Despite being signed on or about October 22, 2018, the Operating Agreement states that it is dated January 5, 2016, potentially due to a typographical error.

6

Accordingly, should any person or entity become a Member, such Member would not be permitted to manage the Company.

23.    The Company serves as the managing entity of the two operating subsidiaries.  In exchange for providing this service, the Company receives a Management Fee for its management of its two operating subsidiaries, pursuant to Section 4.06(b) of the subsidiaries' operating agreements.  Plaintiff and Defendant were each entitled to 50% of the Management Fee.  *See* Ex. A § 6.9.

### A.  Major Decisions and the Buy/Sell Provision

24.    Section 6.2 of the Operating Agreement, the Major Decisions provision, enumerates various significant actions that cannot be undertaken without the prior written consent of the other Manager.  Among other things, that provision does not allow the Company's Operating Agreement to be modified without the prior written consent of the other Manager.  Ex. A § 6.2(a).

25.    Section 6.5 of the Operating Agreement is the Buy/Sell Provision.  Pursuant to that provision, if either Manager determines in good faith that an irreconcilable impasse has been reached with respect to a Major Decision, that Manager (the "Offeror") may exercise the Buy/Sell Provision by making an offer to either sell the Offeror's stake for a stated price, or to buy the stake of the other Manager (the "Offeree") for the same stated price.  Ex. A § 6.5(a)-(b).

26.    The Buy/Sell Provision allows the Offeree to choose whether to purchase the Offeror's shares at the stated price or to sell the Offeree's interest in the Company for that same price.  Ex. A § 6.5(c).  By giving the Offeree this option, the Buy/Sell Provision is designed to encourage the Offeror to set a fair price.  If the price is artificially low, the Offeree might choose to purchase the Offeror's interest at a discount to its fair value.  If the price is too high, the Offeree might choose sell their interest at a premium to its fair value.

7

27.     Either way, the Offeror's offer is binding and irrevocable.  The Offeree has 30 days to choose whether to elect to purchase the Offeror's interest or sell the Offeree's interest.  If the Offeree chooses to purchase the Offeror's interest, the Offeree provides a deposit amounting to 10% of the purchase price.  *See* Ex. A § 6.5(c).

28.     The price stated in the offer represents "the price to be paid for all assets of the Company," thereby necessitating adjustment in the event that the seller extracts assets from the Company after the offer has been accepted.  As explained below, that is precisely what happened here, to the tune of another $375,000 that Defendant transferred to himself *after* Plaintiff elected to buy his interest for $1,400,000.

29.     The Closing of the Buy/Sell transaction is to take place within 60 days of the acceptance of the Buy/Sell offer, on a date set by the purchaser.  *See* Ex. A § 6.5(c).  The parameters for Closing are simple by design.  On the Closing date, the purchaser sends a wire transfer for the remaining purchase price owed, and the seller "shall deliver to the purchasing Member an executed assignment of the selling Member's total Interest sufficient to convey such Interest to the purchasing Member free and clear of any liens or encumbrances."  *See* Ex. A § 6.5(d).

30.     This narrow set of terms reflects the straightforward nature of the Buy/Sell transaction.  The purchaser provides the remaining purchase price, and the seller delivers their interest in the Company.  No additional terms are contemplated, implied, or required.

31.     If the seller fails to meet these obligations on the Closing date set by the purchaser, the seller is in default.  Pursuant to the Operating Agreement, the purchaser thereby becomes entitled to "pursue the equitable remedy of specific performance and the Defaulting Member shall pay the attorneys' fees of the Nondefaulting Member."  *See* Ex. A § 6.5(e).

**B.  Transfer Restrictions**

32.     The Operating Agreement generally prohibits either Member from transferring their interests in the Company to third parties.  *See* Ex. A § 9.1(a).

33.     Transfers are permitted under a narrow set of exceptions.  Relevant here, a Member may transfer their Interests in the Company to immediate family members, a trust for estate planning purposes, or certain Affiliates.  *See* Ex. A § 9.1(b).  Doing so, however, carries important consequences.  When such Interests are transferred from a Member to one of these permitted transferees, the Interests lose their voting rights and do not entitle the transferee to serve as a Manager.  *See* Ex. A § 9.1(b) ("No Interest transferred pursuant to this Section 9.1(b) or transferred pursuant to operation of law, or inherited, shall carry with it any voting rights or entitle any transferee thereof to be a Manager of the Company.").

34.     Furthermore, if a Member transfers their entire Interest in the Company, they may be removed from their position as Manager.  *See* Ex. A § 6.11 ("A Manager may be removed only for Cause.  "Cause" means . . . (iii) a Manager ceasing to be a Member").

**II.    Defendant Pushes Plaintiff Away from the Company**

35.     Shortly after forming the business together in 2012, Plaintiff and Defendant both began to work approximately full-time managing the Brooklyn club, as well as managing the Chicago club when it opened in 2018.  Defendant had insisted that Plaintiff give up her other endeavors and fully commit her career to managing the Royal Palms clubs.  Thus, although Defendant routinely boxed Plaintiff out of decisions and undercut her efforts to run the clubs, Plaintiff dedicated the next 8 years of full-time work to managing Royal Palms.  For example, in 2014, shortly after the Brooklyn club opened, Plaintiff rented an apartment directly across the street and was routinely relied upon as the closest key-holder.  In addition to the distributions made

from the operating entities, Plaintiff's half of the Management Fee was her most significant and reliable source of income.

36.     Beginning in approximately 2021, Defendant changed his tune and began to take the position that Plaintiff should no longer be actively involved in managing the business, and that Defendant should be solely responsible for management.  Although it was not her idea or her preference to take a step back, Plaintiff endeavored to accommodate Defendant's request by giving him more autonomy in managing the business.

37.     On June 9, 2022, Defendant demanded that Plaintiff cede to him the entirety of the Management Fee under the Operating Agreement.  They had been splitting the Management Fee evenly since forming the business in 2012, in line with their status as equal partners in the business. Defendant's stated rationale was that he had taken on all managerial responsibility.  Plaintiff responded that she was not willing to give up her half of the management fees, that she had only stepped back from a managerial role because Defendant had insisted that she do so, and that she was ready and willing to resume full-time management work.  Defendant rejected Plaintiff's proposal that she resume working full-time, stating that it was easier for him to run the clubs without her.

38.     Unhappy to be sharing the Management Fee and unwilling to go back to working together with Plaintiff as partners, Defendant instead began working out a plan to try to force Plaintiff out of the business.  In January 2023, Defendant met with Plaintiff and proposed buying her interest in the Company.  Plaintiff rejected the proposal and informed him that they were equal partners in the business, even if his preference was to be the sole owner.

39.     In the Fall of 2023, Defendant suggested that instead they simply sell the Company. He asked Plaintiff to look for potential buyers.  Although Plaintiff obtained indications of interest

from several potential buyers over the ensuing months, Defendant found different reasons to reject each one.

40.    In February 2024, Defendant announced to the staff of the Royal Palms clubs that he was going to become semi-retired and go into what he termed "grizzin'," or hibernating in the manner of a grizzly bear, unless and until he became the sole owner of the club.  Beginning around that time, Defendant apparently largely stopped visiting the clubs or leading the staff.

### III.    Schnapp Offers to Buy or Sell the Company

41.    Unable to claim Plaintiff's Management Fee for himself, and unsatisfied with Plaintiff remaining a co-owner of the Company, Defendant set out to manufacture a deadlock under the Major Decisions provision of the Operating Agreement in an attempt to force Plaintiff to sell her half of the Company to him using the Buy/Sell Provision.

42.    On November 18, 2024, Defendant sent a written request for Plaintiff's consent to an amendment to the Operating Agreement.  His request for consent was made under the Major Decisions provision.  Defendant's proposed amendment to the Operating Agreement called for Section 6.9 to be modified to allocate 100% of the Management Fee to Defendant, and 0% to Plaintiff, as opposed to the 50%/50% split contemplated under the Operating Agreement.  *See* Ex. B.

43.    Defendant's outrageous proposed amendment was, of course, unacceptable to Plaintiff.  On December 6, Plaintiff rejected Defendant's requested amendment.

44.    On December 11, 2024, Defendant emailed Plaintiff stating that they had "arrived at an impasse in regards to a major decision" and noting that "the option for a buy/sell offer is provided for in section 6.5 of our operating agreement."  Defendant's email made clear that any cash withdrawals made following the Buy/Sell Offer would result in an adjustment to the

applicable purchase price. Specifically, Defendant took steps before invoking the Buy/Sell provision to carve out a $100,000 distribution for each partner, writing: "In preparation for this imminent buy/sell offer and the effective end of our partnership, I've removed 100k from our operating account. I'd suggest that you do the same. My buy/sell offer will not include these assets." *See* Ex. C. The unambiguous implication of Defendant's message was that his forthcoming Buy/Sell Offer would not include the $100,000 of cash per partner that he approved for distribution prior to making the Buy/Sell Offer, but that the Company assets included in the Buy/Sell Offer would include all other assets of the Company, including all other cash.

45.     On December 14, 2024, Defendant sent an email purporting to invoke the Buy/Sell Provision. On December 17, 2024, Defendant's Buy/Sell Offer was delivered to Plaintiff by FedEx. *See* Ex. D.

46.     In his Buy/Sell Offer, Defendant stated that he had determined that Plaintiff's refusal to consent to his proposed modification to the Management Fee had caused an irreconcilable impasse. Pursuant to the Buy/Sell Provision, Defendant offered either to sell his Interest in the Company for $1,400,000 or to buy Plaintiff's Interest in the Company for that same price. *See* Ex. D. As noted above, Defendant's December 11 email had made clear that the $1,400,000 offer would include all assets of the Company other than a distribution of $100,000 of cash per partner approved before Defendant made the Buy/Sell Offer. *See* Ex. C.

47.     On January 8, 2025, Defendant stated in an email to Plaintiff's counsel that he did not think legal counsel would be necessary because he thought the process would be a "fairly simple purchase or sale" pursuant to the "relatively straight-forward operating agreement."

48.     On January 11, 2025, Plaintiff responded through her counsel, Attorney Fahner, and informed Defendant that she was electing to purchase Defendant's Interests in the Company

pursuant to Defendant's offer under the Buy/Sell provision.  Counsel for Plaintiff attached a proposed streamlined draft agreement documenting the transaction, informed Defendant that the transaction would be completed within 60 days as contemplated by the Operating Agreement, and stated that the 10% deposit ($140,000) was held in Plaintiff's counsel's escrow account.  *See* Ex. E.

49.     On January 12, 2025, Defendant responded by email to Plaintiff's counsel, stating that "we're both looking for a smooth and quick closing" and asking whether the Company's counsel could represent Defendant in the transaction.  He also noted that there were certain health insurance matters that had previously been discussed that had not been included in the documentation.  This response demonstrates that Defendant understood that Plaintiff had accepted Defendant's offer to sell his half of the Company.

50.     On January 14, 2025, Defendant changed his tune.  Apparently unhappy with Plaintiff's acceptance of Defendant's offer to sell his Interest in the Company, Defendant sent Plaintiff a text message threatening that "[i]t feels like we're on the edge of a really painful litigation here that will cost both of us hundreds of thousands of dollars."  Contrary to that message, however, Defendant had no good faith cause for concern that the transaction would result in costly litigation if he followed through on his obligations.  The Buy/Sell Provision that he invoked was designed to ensure that Plaintiff, as the Offeree, could either sell her half of the Company or buy his half of the Company at a price set by Defendant.  As Defendant himself had put it, the transaction would be "fairly simple."

51.     Instead, Defendant's transparent threat made clear that Defendant, despite having decided to invoke the Buy/Sell provision himself and set his own price for half of the Company,

13

would seek to thwart his own proposed transaction and drive up costs if he did not get his way. Over the proceeding months leading up to this litigation, he did just that.

52.    On January 14, 2025, Attorney Fahner followed up with Defendant about Defendant's concerns regarding the agreement.  Attorney Fahner reiterated that "[Plaintiff] has accepted your offer to sell your share of the business" and offered to review any comments or revisions to the proposed transaction agreement and consult with Defendant's counsel, should he retain any.

53.    On January 16, 2025, counsel for Defendant emerged, sending Attorney Fahner a letter claiming for the first time that Plaintiff's acceptance was "defective" because she had not delivered the 10% deposit to Defendant and because the proposed transaction documentation sent by Attorney Fahner had included certain contingencies.  Defendant's counsel claimed that because Plaintiff "did not correctly respond," the Buy/Sell Offer had lapsed on January 13, 2025, and Plaintiff was thereby deemed to have elected to sell her Interest pursuant to the Buy/Sell Provision. *See* Ex. F.

54.    Defendant's excuses regarding Plaintiff's acceptance had no merit.  Plaintiff had placed the 10% deposit in escrow and had received no wire instructions from Defendant. Furthermore, Plaintiff's election to purchase Defendant's Interest in the business was unequivocal. Defendant's contention that the proposed first-draft of documentation to memorialize the transaction constituted a "counteroffer" is spurious.

55.    Defendant's decision to remain silent until after he thought the acceptance period had ended is telling.  Rather than desiring any clarity as to whether Plaintiff had elected to buy his Interests pursuant to his offer (which was already abundantly clear), Defendant waited until after

he thought the 30-day offer period had ended before raising meritless technical concerns about Plaintiff's acceptance.

56.    But in addition to Defendant's purported concerns being meritless, his timing was wrong.  While Defendant had emailed Plaintiff setting out the Buy/Sell Offer on December 14, 2024, Plaintiff had received Defendant's Buy/Sell Offer by Federal Express on December 17, 2024.  Accordingly, the 30-day period in which Defendant's offer could be accepted did not expire until January 16, 2025.

57.    Thus, on January 16, 2025, Plaintiff took further steps to ensure there was no ambiguity as to her election to purchase Defendant's Interests, in light of his grasping attempts to avoid the consequences of his own offer.  Attorney Fahner wrote back on behalf of Plaintiff:

> For the avoidance of doubt, Ms. Albert accepts Jonathan Schnapp's offer to sell his membership interests in [the Company.]  The Acquisition Agreement provided on January 11, 2025 was merely intended to facilitate the transaction and in no way limited or conditioned Ms. Albert's acceptance of the offer.

He further stated that Defendant had provided no instructions on where to send the deposit, which Attorney Fahner was holding in escrow, and requested that Defendant "please inform us where to send the funds."  *See* Ex. G.  That evening, in light of Defendant's silence regarding the placement of the deposit, Plaintiff went so far as to place an additional $140,000 (*i.e.*, a second full deposit) into a bank account that was jointly held by Plaintiff and Defendant, and informed Defendant of the same.

58.    As detailed below, Defendant spent the ensuing months obstructing the closing of the transaction while diverting value from the Company to himself, before finally agreeing to take possession of Plaintiff's deposit on March 5, 2025.

### IV.    Defendant Extracts Assets from the Company

59.    As Defendant began to realize that he would be obligated to sell his Interest in the Company to Plaintiff pursuant to the Buy/Sell Provision, Defendant shifted his focus to extracting as much value from the Company to himself as possible in advance of the Closing.

60.    On or about January 29, 2025, Defendant unilaterally directed the Company's fractional CFO to facilitate massive distributions of assets from the Company's operating subsidiaries, amounting to a total of nearly $1.2 million.  Defendant caused the Brooklyn operating subsidiary, Royal Palms Shuffleboard Club, LLC ("RPSC"), to make $1,000,000 in distributions, with $405,000 going to RPSC's limited partner investors and the remaining $595,000 being upstreamed to the Company.  Defendant also caused the Chicago operating subsidiary, Royal Palms Chicago LLC ("RP Chicago"), to distribute $100,000, consisting of $70,000 distributed to RP Chicago's limited partner investors, and the remaining $30,000 upstreamed to the Company. Finally, Defendant caused RP Chicago to repay $77,613 in principal on a loan that had been made by the Company to RP Chicago in 2018.

61.    These transfers left the subsidiaries in a dangerously low liquidity position, with cash balances far below their average balances over the preceding year.  Defendant caused these unprecedented transfers to be effectuated without any prior notice to Plaintiff—his co-Manager, equal owner, and future sole owner of the Company.  Plaintiff is aware of no legitimate business justification for these extraordinary distributions, let alone for Defendant's decision to make them unilaterally without so much as consulting her.  Defendant has never provided any such justification, instead claiming, without substantiation, that they were "ordinary."

62.    Defendant's next step made the rationale for the distributions—self-enrichment—abundantly clear.  Defendant used the large amounts of money he had upstreamed to the Company

to pay himself, in an impermissible attempt to artificially increase the effective sale price for his Interests.  On January 30, 2025, Defendant transferred $325,000 from the Company to himself as a purported "distribution."  On February 3, 2025, he transferred himself another $50,000 from the Company.  Notably, at this point Plaintiff had already elected to purchase Defendant's total Interest in the Company, including its cash and all of its other assets, for $1,400,000.

63.     After Defendant made these transfers, Plaintiff repeatedly requested that Defendant unwind them so as to avoid jeopardizing the liquidity of the operating entities, and because Defendant was not permitted to adjust the effective sale price of his Interest by transferring assets to himself.  Defendant refused to unwind the asset transfers.  On February 27, 2025, after attempting to reach a resolution for several weeks, Plaintiff completed her own equal distribution of $375,000 from the Company to protect her interests and mitigate the risk that Defendant would misappropriate the remaining Company assets.

64.     As a result of Defendant's unjustified transfer of $375,000 from the Company to himself, the purchase price owed at Closing is required to be reduced by this amount.  The purchase price is the price "to be paid for all assets of the Company" when the Buy/Sell Offer was delivered on December 17, pursuant to the Buy/Sell Provision.  *See* Ex. A § 6.5(b).  Thus, having already taken $375,000 of those assets for himself, Defendant is not entitled to receive the full purchase price at Closing.

65.     This adjustment requirement was confirmed by Defendant on December 11, prior to his making the Buy/Sell Offer.  As noted above, Defendant specifically carved out a distribution of $100,000 per partner prior to making the Buy/Sell Offer and noted that the Buy/Sell Offer did not include those assets.  The corollary of that exclusion is that all of the Company's other assets,

including the $375,000 in cash unilaterally withdrawn by Defendant, were included in the Buy/Sell Offer. As a result, the price to be paid at Closing must be adjusted downward by $375,000.

66.     On February 7, 2025, Defendant further confirmed that the Operating Agreement calls for a $375,000 purchase price adjustment at Closing. Specifically, Defendant emailed Plaintiff with a new purported offer to purchase Plaintiff's Interest in the Company, along with her interest in another related entity. Defendant's new offer stated that Plaintiff would receive both the $1,400,000 purchase price and her own $375,000 distribution, in addition to the $100,000 distribution approved prior to the Buy/Sell Offer, as well as a salary as a paid consultant. By including the $375,000 distribution as a proposed price improvement to the Buy/Sell Offer, Defendant's purported new offer further demonstrates that his initial Buy/Sell Offer necessarily included all assets of the Company, including the $375,000 in cash Defendant transferred to himself. Otherwise, she would have been entitled to that $375,000 distribution as a matter of course, even if she had been the Seller rather than the Buyer.

67.     Despite these previous confirmations, now that Defendant is the Seller under the Buy/Sell Provision, rather than the Buyer, he has refused to acknowledge the required adjustment to the purchase price. Instead, Defendant has erroneously insisted that the full purchase price, without adjustment for his unilateral $375,000 distribution, be paid at Closing. Defendant's refusal to acknowledge the required adjustment is without basis. The amount to be paid by Plaintiff when specific performance of the Closing is ordered must be reduced by $375,000 to reflect this required adjustment.

## V.    Defendant Secretly Transfers His Interests in the Company

68.     Having transferred hundreds of thousands of dollars in funds from the Company to himself, Defendant continued his efforts to complicate the transaction and delay the Closing.

18

69.     On February 18, 2025, Defendant entered into a transaction with the Schnapp Family Business Trust (the "Schnapp Trust").  In that transaction, Defendant sold his entire Interest in the Company to the Schnapp Trust.  *See* Ex. H.  He did so without informing Plaintiff, and he continued to negotiate transaction documentation for weeks afterwards without so much as mentioning that his entire Interest had been transferred to a third party.  He did not disclose that fact until March 12, 2025.

70.     Defendant's sale of his Interest in the Company to the Schnapp Trust was irrevocable.  *See* Ex. H § 1.1.  The Trustee of the Schnapp Trust is a third-party entity, defendant LAC Services I, Inc. ("Trustee").  Pursuant to the Schnapp Trust documentation, "all property, income, and profit . . . shall be controlled by the Trustee," and "[t]itle to all assets of the Trust shall be vested in the Trust until the Trust dissolves."  Ex. I (Schnapp Trust) at Art. II.D, Art. II.E.  The Trustee also serves as the Grantor and sole Beneficiary under the Schnapp Trust.  *See* Ex. I at Recitals; Ex. I at Exhibit A (Beneficiaries).

71.     Defendant's transfer of his Interest in the Company carried significant consequences.  Upon such transfer, Defendant's Interest lost its voting rights pursuant to the Operating Agreement, which is designed to vest management and voting power only in the two original Members.  *See* Ex. A § 9.1(b).  Furthermore, upon the disposition of his entire Interest in the Company, Defendant ceased to be a Member, thereby allowing him to be removed as a Manager by Plaintiff.  *See* Ex. A at § 6.11.  As discussed further below, Plaintiff removed Defendant as a Manager upon learning of his undisclosed transfer of his Interest.

72.     Despite transferring his entire Interest to the Schnapp Trust on February 18, Defendant spent the next several weeks negotiating transaction documentation as though he

remained the sole owner of his Interest, all while hiding the fact that he had transferred his Interest and was no longer a Member of the Company.

## VI.    Defendant Imposes Unreasonable Demands and Defaults at Closing

73.    The Operating Agreement calls for Closing of the Buy/Sell transaction to take place within 60 days of acceptance of the Buy/Sell offer, on a date to be set by the purchaser. *See* Ex. A § 6.5(c).

74.    Over the weeks following Plaintiff's election to purchase Defendant's Interest, Defendant made increasingly unreasonable demands for concessions found nowhere in the Operating Agreement, which calls for a simple transfer of Interests in exchange for the purchase price.  Among other things, Defendant demanded:

- That he be paid the full $1,400,000 purchase price notwithstanding his withdrawal of $375,000 after acceptance of the offer to sell his Interest, effectively raising the price to $1,775,000;

- That he be released from lease guarantees pertaining to real estate leases between the operating subsidiaries and their landlords;

- That he be indemnified against liability resulting from his past actions as a Member or Manager;

- That he be indemnified against all costs relating to a lease for a Chicago apartment that he signed on his own and used for his own benefit;

- That Plaintiff agree not to transfer more than 40% of her Interest in the Company for one year following Closing.

75.    These terms are not contemplated by the plain language of the Operating Agreement.  As Defendant himself stated when he thought that he would be the purchaser, the transaction would be "simple" and "straightforward."

76.    Pursuant to the 60-day period outlined in the Operating Agreement, Closing was to occur on or before March 12, 2025, based on Plaintiff's January 11, 2025 election to purchase

Defendant's Interest. In an effort to close on time and avoid litigation, Plaintiff negotiated with the goal of completing the transaction as efficiently as possible notwithstanding Defendant's unreasonable extracontractual demands. In doing so, she accommodated numerous requests by Defendant in the draft documentation. She made these accommodations despite the plain language of the Operating Agreement calling for a simple sale transaction and expressly providing her the remedy of specific performance and attorneys' fees if Defendant defaulted on his obligation to transfer his Interest in the Company to her at Closing.

77.     On March 5, one week before the Closing deadline, Defendant for the first time provided wire instructions for the deposit and demanded that Plaintiff's $140,000 deposit be transferred to him. Up until that point, Defendant had refused to provide wire instructions or accept a check for the $140,000 deposit, apparently in service of his frivolous contention that Plaintiff had not made a valid election under the Buy/Sell Provision when she accepted his offer on January 11.

78.     Even while suddenly demanding the deposit on March 5, Defendant flatly refused to acknowledge the validity of Plaintiff's acceptance under the Buy/Sell Provision and would not even commit to completing the transaction by executing a simple transfer of his Interest on the Closing date, to the extent the parties did not come to mutual agreement on a more extensive set of documentation. Defendant's counsel refused to send their revised draft of the documentation being negotiated until Plaintiff agreed to transfer the deposit, notwithstanding Defendant's total lack of assurances that he would in fact complete the Buy/Sell transaction pursuant to his obligations under the Operating Agreement.

79.     Despite Defendant's unreasonable conduct, Plaintiff remained committed to completing the transaction without litigation. Thus, on March 7, she transferred the $140,000

deposit to the account specified by Defendant, trusting in good faith that Defendant would complete the transaction pursuant to his obligations the following week. The parties continued to negotiate transaction documentation, purportedly with the intention of closing by March 12. Defendant still holds Plaintiff's $140,000 deposit to this day.

80.     By March 12, Plaintiff had spent many hours and thousands of dollars in legal fees negotiating proposed documentation accommodating a great many of Defendant's extracontractual requests. Among other things, Plaintiff agreed to cooperate with Defendant in securing his release from guarantees under leases to the operating subsidiaries after Closing.

81.     Plaintiff was under no obligation to agree to these generous terms and could have insisted on a simple transfer of Defendant's interests. Indeed, the Buy/Sell Provision obligated Defendant to transfer his Interest in the Company free and clear of any liens or encumbrances. *See* Ex. A at Section 6.5(d)(3). To the extent Defendant believed his Interests in the Company were somehow encumbered by personal guarantees on leases with the Company's subsidiaries, then it would be Defendant's responsibility to procure releases from such guarantees, not Plaintiff's.

82.     March 12, 2025 was the date that the parties were meant to sign and complete the transaction. That afternoon, mere hours before the wire transfer deadline, Defendant scuttled the deal with a barrage of unreasonable eleventh-hour demands and changes. Defendant demanded that Plaintiff personally make all remaining lease payments on an apartment in Chicago that Defendant had rented out in his own name, purportedly for his use while visiting the Chicago location. He insisted that Plaintiff expressly release all potential claims concerning the $375,000 in distributions that he made to himself, despite knowing that the distributions left the subsidiaries severely undercapitalized, had caused a violation of a bank loan covenant, and resulted in an effective increase in the purchase price by the same amount.

22

83.     Defendant further insisted on shoehorning the following language into the transaction documentation mere hours before Closing: "Neither the Buyer Releasors nor the Seller Releasors are currently aware of any fraud, intentional misrepresentation, willful misconduct, or criminal acts."  In essence, Defendant demanded that Plaintiff acquiesce to all of Defendant's bad acts, despite years of prior misconduct.

84.     The final blow to Plaintiff's hopes for an on-time Closing without litigation came at 2:46pm on March 12, the Closing deadline.  For the first time, Defendant disclosed his secret transfer of all of his Interests in the Company to the Schnapp Trust on February 18, nearly a month earlier.  Defendant's counsel admitted that the transaction documentation would need to be reworked and asked for the Closing to be delayed.

85.     The revelation of Defendant's clandestine transfer to the Schnapp Trust was stunning.  The parties were on the brink of signing an agreement through which Defendant would have purported to transfer an Interest that he no longer owned.  Faced with a previously undisclosed transfer to an unknown entity mere hours before Closing, together with Defendant's last-minute additions of unreasonable demands, Plaintiff was unable to tolerate Defendant's gamesmanship any longer.  She demanded that Defendant either agree to close the transaction under the latest set of documentation or sign a simple assignment of all Interests to the Company, as contemplated by the Operating Agreement.  Otherwise, she stated that Defendant would be held in default for failing to complete the transaction on March 12, the Closing date.  Plaintiff was ready and willing to transfer the balance of the purchase price on that date.

86.     Defendant refused to sign either form of documentation and refused to complete the transaction.  He defaulted on his Closing obligations on March 12, entitling Plaintiff to file suit

to seek specific performance of the Closing, along with all of her attorneys' fees, pursuant to the Operating Agreement. *See* Ex. A § 6.5(e).

**VII.    Plaintiff Negotiates in Good Faith Following Defendant's Default**

87.    On March 13, following Defendant's default under the Operating Agreement and revelation that he had transferred his Interest to the Schnapp Trust and ceased to be a Member of the Company, Plaintiff acted pursuant to the Operating Agreement to remove Defendant as a Manager. *See* Ex. J. Also on March 13, counsel for Plaintiff notified Defendant's counsel regarding Defendant's default, his removal as a Manager, and his obligation to return Company property, including access to Company email accounts. *See* Ex. K.

88.    Despite Defendant being in default under the Operating Agreement, Plaintiff remained willing to work through issues arising out of Defendant's undisclosed transfer to the Schnapp Trust and complete the transaction without a lawsuit. Defendant was not so willing, instead brazenly insisting on even more changes to the parties' proposed documentation. Among other things, Defendant now demanded that he be released from guarantees with third-party landlords *prior* to Closing, rather than agreeing to work together to secure such releases after Closing. Releases from these guarantees are neither explicitly nor implicitly called for under the Operating Agreement, and Plaintiff's offer to assist with such releases was entirely voluntary.

89.    Working in good faith to avoid litigation despite Defendant's unjustified demands and his default at Closing, Plaintiff engaged in discussions with the landlord for the New York subsidiary concerning a possible release of Defendant from his guarantee of the lease at Closing. Plaintiff learned from the landlord that an additional security deposit amounting to $210,337.50 would be required to swap the guarantee from Defendant to Plaintiff and a financial backer of Plaintiff.

90.     The Buy/Sell Provision does not contemplate the Defendant being released from lease guarantees of any kind, let alone those pertaining to subsidiary entities.  Despite that, Defendant refused to carry any of the financial burden associated with the security deposit, even though such a deposit was only required due to his extracontractual insistence on being released from the subsidiary lease guarantee.  Notably, the $375,000 in assets that Defendant transferred to himself as an effective purchase-price increase would have been more than enough to meet the burden of this additional security deposit.

91.     Despite Defendant's egregious conduct before and after his default under the Operating Agreement, Plaintiff remained willing to do everything within her power to close the transaction so that she could get on with running the business.  On March 27, 2025, despite having no obligation to do so under the Operating Agreement, Plaintiff even indicated that she was willing to provide the $210,337.50 security deposit to the New York landlord to facilitate Defendant's release from the guarantee, solely to facilitate a prompt Closing without litigation.

92.     On March 27, 2025, Defendant's counsel disclosed that Defendant had purported to rescind the Schnapp Trust and transfer the Interests from the Schnapp Trust back to himself.  Such a transaction is prohibited by the Operating Agreement without Plaintiff's prior consent.  *See* Ex. A § 9.1(a).  Yet another eleventh-hour change to the ownership structure and transaction documentation further underscores that Defendant's desire appeared to be only to delay and derail the completion of the sale, all while distracting Plaintiff from managing the business and driving up legal costs.

93.     On March 29, 2025, Attorney Fahner responded requesting additional information on those purported transactions, including a schedule of Members and documentation necessary to understand the purported rescission of the transfer to the Schnapp Trust, along with an

explanation of Defendant's decision to purportedly unwind all of the Schnapp Trust transactions and change the structure yet again. Defendant failed to respond to most of these requests and has never provided any explanation or justification for these maneuvers.

94.    Plaintiff spent the next several weeks attempting to resolve disagreements in good faith and find solutions that would allow the transaction to close without a lawsuit. Plaintiff made these efforts despite having already offered to compromise on numerous onerous financial concessions not required under the Buy/Sell Provision. Additional burdens imposed by Defendant include his effective purchase-price increase of $375,000 and the $210,337.50 security deposit required to meet Defendant's extra-contractual demand to be released from guarantees. Taken together, those financial burdens amount to more than 40% of the agreed-upon purchase price.

95.    Despite these concessions, Defendant continued to insist on commercially unreasonable terms not contemplated under the Buy/Sell Provision, including broad indemnifications concerning his own conduct and a representation by Plaintiff that she was unaware of any fraudulent act committed by Defendant—despite serious concerns regarding his conduct leading up to his default under the Buy/Sell Provision. Defendant also insisted on being indemnified for all expenses relating to the above-mentioned Chicago apartment, despite Defendant being the sole beneficiary of that apartment lease and having incurred those costs without Plaintiff's consent, and despite the fact that such reimbursement is not contemplated under the Buy/Sell Provision.

96.    Defendant then raised yet another demand for an unwarranted economic incentive. On May 1, 2025, Defendant's counsel informed Plaintiff's counsel that Defendant would not complete the transaction without being paid the Management Fee for the first quarter of 2025. Defendant was not entitled to any such Management Fee, including because the only reason the

transaction did not close within the first quarter of 2025 is that Defendant defaulted at Closing. Moreover, as explained above, Defendant was removed as a Manager on March 13, 2025.

97.     Once again contending with Defendant's ongoing delays, newly raised demands, and last-minute changes, Plaintiff decided that the transaction either needed to be closed or litigated.  Among other reasons, Plaintiff had voluntarily negotiated with the New York club's landlord to secure a proposed release of Defendant from his guarantee of the New York club's lease.  But the landlord had set a termination date of May 31 for that release if the sale transaction was not completed by that date.  Thus, on May 20, 2025, Plaintiff informed Defendant that the closing would take place the following week and requested that the proposed transaction documentation promptly be signed and returned.  At that point, Defendant already had Plaintiff's latest draft of the purchase agreement since April 18, more than a month earlier.

98.     On May 23, 2025, Plaintiff's counsel provided Defendant with the executed guarantee release from the New York landlord, which, as noted above, was set to expire on May 31 if the transaction did not close by then.  Accordingly, Plaintiff's counsel stated that the transaction should be closed on May 28, 2025, and that Defendant should sign all transaction documentation by noon on May 27.  Finally, Plaintiff's counsel made clear that Plaintiff would not agree to any further negotiations or economic concessions, including regarding the Chicago apartment or the Management Fee.  Plaintiff's counsel informed Defendant's counsel that he was available over the holiday weekend to discuss any issues with the timeline so that the documentation could be signed on May 27 and the transaction closed on May 28.

99.     Defendant failed to sign the documentation on May 27.  On the morning of May 28—the closing date set by Plaintiff—Defendant's counsel stated that they would respond later that day, but they never did.  Only at 4:02pm on May 29, the day after closing was scheduled, did

Defendant respond relenting on his unwarranted demands for payments relating to the Chicago apartment and the Management Fee.

100.    Instead, Defendant once again proposed last-minute substantive changes to the purchase agreement, which had been sitting with Defendant since April 18. Those changes would further expand his releases from potential liability. Defendant also for the first time raised issues with another voluntary proposed guarantee release that Plaintiff's counsel had sent nine days earlier. Defendant's attempt to shoehorn further changes to the deal, on the eve of the last possible date to close the transaction and wire funds before the New York guarantee release expired on May 31, sabotaged any hope of closing the transaction. This tactic once again demonstrates that Defendant's real aim was to hinder any possibility of a fair and equitable closing.

101.    Although Plaintiff offered to make numerous unrequired accommodations in an effort to avoid litigation, she can only make so many concessions before the only fair and viable option is to litigate to enforce the transaction on its initially agreed-upon terms. That time has come. Defendant's pattern of unreasonable demands, delays, and defaults leave Plaintiff with only one reasonable inference: That Defendant never intended to complete the transaction, or at least not on terms that are remotely fair, reasonable, or in line with what the Operating Agreement contemplated. Accordingly, Plaintiff is left with no choice but to seek specific performance of the Closing pursuant to the terms contemplated by the Operating Agreement, including the aforementioned $375,000 purchase-price adjustment, without the extracontractual concessions requested by Defendant. In accordance with the Operating Agreement, Plaintiff also seeks her attorneys' fees.

## CLAIMS FOR RELIEF

## COUNT ONE

## BREACH OF CONTRACT – SPECIFIC PERFORMANCE

102.    Plaintiff repeats and incorporates by reference all of the allegations above as though fully set forth herein.

103.    The Operating Agreement is a binding and enforceable contract between Plaintiff and Defendant.

104.    Defendant has breached the Operating Agreement.  Among other breaches, Defendant failed on the Closing Date to deliver to Plaintiff an executed assignment of his total Interest sufficient to convey such Interest to Plaintiff free and clear of any liens or encumbrances, pursuant to Section 6.5(d).

105.    Pursuant to Section 6.5(e), Plaintiff is entitled to specific performance of Defendant's Closing obligations.  Specifically, Plaintiff is entitled to an order directing that Defendant and the Trustee of the Schnapp Trust deliver an executed assignment of Interests sufficient to convey such Interest to Plaintiff free and clear of any liens or encumbrances.  Damages are an inadequate remedy, as Plaintiff is entitled under the Operating Agreement to become the sole owner of the Company.

106.    Concurrently with the delivery of such an assignment of Interests, Plaintiff requests that the Court order Plaintiff to pay only the remaining balance of the purchase price, amounting to $885,000.  That amount represents the $1,400,000 purchase price after adjustment for the $375,000 of cash assets transferred from the Company to Defendant after Plaintiff elected to purchase Defendant's total Interest, resulting in a $375,000 adjustment to the purchase price

pursuant to Sections 6.5(b)-(c) of the Operating Agreement, and further adjusted for the $140,000 deposit already paid by Plaintiff to Defendant.

107.    Pursuant to Section 6.5(e) of the Operating Agreement, Plaintiff is entitled to all of her attorneys' fees, to be awarded as damages in an amount to be determined at trial.

**COUNT TWO**

**DECLARATORY JUDGMENT**

108.    Plaintiff repeats and incorporates by reference all of the allegations above as though fully set forth herein.

109.    On March 12, 2025, Plaintiff first learned that Defendant had surreptitiously transferred his entire Interest in the Company to a third party on February 18, 2025, and that Defendant therefore was no longer a Member of the Company.  On March 13, 2025, Plaintiff removed Defendant as a Manager pursuant to Section 6.11 of the Operating Agreement, as Defendant had transferred his Interest and was no longer a Member of the Company.  *See* Ex. J. (Resolution).  Plaintiff advised Defendant of his removal that day.  *See* Ex. K.

110.    Ignoring the clear language of Section 6.11, Defendant has refused to acknowledge his removal and contends, inaccurately, that he is still a Manager.  His erroneous position threatens to undermine Plaintiff's position as the Company's sole Manager and places her at risk of ongoing harm.

111.    In the meantime, Defendant has refused to provide Plaintiff access to his business email address, even though she is the sole Manager of the Company and Defendant is no longer a Manager or Member.  Although he eventually provided access to another member of the Company's management team, Defendant has not acknowledged his removal as Manager, nor Plaintiff's right to access Defendant's business email address.  Defendant's refusal to cooperate or

acknowledge Plaintiff's position as sole Manager leaves Plaintiff unable to effectively carry out her duties as Manager.

112.    On or about March 27, 2025, Defendant purported to rescind the Schnapp Trust and transfer Interests in the Company from the Schnapp Trust back to Defendant.  Such a transfer is not permitted under Section 9.1(a) of the Operating Agreement, as it is not a transfer falling into the permissible transfers set forth in Sections 9.1(b), (c), or (d), and Plaintiff was not informed of and did not consent to this transfer.  Accordingly, such transfer is void.

113.    Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

114.    An actual or justiciable case or controversy exists between Plaintiff and Defendant concerning:

(i)     the validity of Plaintiff's removal of Defendant as a Manager of the Company pursuant to Section 6.11 of the Operating Agreement;

(ii)    Defendant's loss of his voting rights and status as a Member of the Company upon the transfer of his Interest to the Schnapp Trust pursuant to Section 9.1(b) of the Operating Agreement; and

(iii)   the invalidity of the Schnapp Trust's purported transfer of Interests to Defendant pursuant to Defendant's purported rescission transaction, in violation of Section 9.1(a) of the Operating Agreement.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment and relief against Defendant, as follows:

    A.  Granting all relief requested in this Complaint;

    B.  Ordering Defendant and the Trustee to specifically perform the obligations under Section 6.5 of the Operating Agreement and complete the Closing by delivering executed assignments sufficient to convey all Interests of Defendant's and the Schnapp Trust's to Plaintiff, representing Defendant's former total Interest in the Company, free and clear of any liens or encumbrances, in exchange for the transfer of the remaining adjusted purchase price of $885,000;

    C.  Awarding Plaintiff all of her attorneys' fees and costs in an amount to be determined at trial, pursuant to Section 6.5(e) of the Operating Agreement;

    D.  Declaring that Plaintiff validly removed Defendant as a Manager under the Operating Agreement as of March 13, 2025, and that Defendant is no longer a Manager of the Company;

    E.  Declaring that Defendant, having transferred his Interests to the Schnapp Trust, is no longer a Member of the Company and no longer has any voting rights in the Company;

    F.  Declaring that the Schnapp Trust's purported transfer of Interests to Defendant is void as a violation of Section 9.1(a) of the Operating Agreement; and

    G.  Such other relief as the Court considers just and proper.

Dated: May 30, 2025

Respectfully submitted,

/s/ David E. Kirk

**KIRK & INGRAM, LLP**
David E. Kirk
43 West 43rd Street, Suite 279
New York, NY 10036
Telephone: (212) 859-3504
DKirk@kirkingram.com

*Counsel for Plaintiff Ashley Albert*