# Exhibit H

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**") dated as of __February 18, 2025__, is by and between Jonathan Schnapp (the "**Seller**"), and LAC Services I, Inc. as Trustee of THE SCHNAPP FAMILY BUSINESS TRUST (the "**Buyer**"). Seller and Buyer are each referred to herein as a "**Party**" and collectively as the "**Parties**".

### RECITALS:

WHEREAS, Seller owns fifty percent (50%) of the membership interest (the "**Membership Interest**") in Biscuits and Tangs, LLC, a New York limited liability company (the "**Company**")

WHEREAS, Pursuant to Section 9.1 of the Operating Agreement of the Company dated January 5, 2016, a member of the Company may, without the written consent of the other member, transfer its membership interest to one or more trusts for estate planning purposes.

WHEREAS, Buyer, a business trust wishes to purchase, and Seller agrees to sell all Membership Interest, free and clear of all liens and encumbrances, and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants, and agreements set forth herein the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

### ARTICLE 1
### PURCHASE AND SALE

1.1   Purchase and Sale of Membership Interest. Subject to the terms and conditions set forth in this Agreement, Buyer hereby irrevocably agrees to purchase all of the Membership Interest from Seller, and Seller hereby irrevocably agrees to sell all of the Membership Interest to Buyer, free and clear of any mortgage, pledge, lien, security interest, claim, community property interest, option, equitable interest, and restriction of any kind, in consideration for a sum of One Million One Hundred Thousand Dollars ($1,100,000) (the "**Purchase Price**").

1.2   Closing. The closing of the purchase and sale of the Membership Interest pursuant to this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") by the remote exchange of signatures. The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

1.3   Seller Closing Deliverables. At Closing, Seller shall deliver to Buyer:

(a) This Agreement executed by each Seller;

(b) An assignment of Membership Interest in the form set forth in Exhibit A, executed by the Seller; and

(c) All other schedules, agreements, documents, instruments, and certificates required to be delivered by Seller at Closing.

1.4   Buyer Closing Deliverables. At Closing, Buyer shall deliver to Seller:

(a) The Promissory Note, pursuant to Section 1.5 below;

(b) This Agreement executed by Buyer;

1

(c) An assignment of Membership Interest in the form set forth in Exhibit A, executed by Buyer; and

(d) All other agreements, documents, instruments, and certificates required to be delivered by Buyer at Closing.

1.5   Payment.  At Closing, Buyer shall, in full payment of the Purchase Price, deliver to Seller an executed promissory note substantially in the form attached hereto as Exhibit B (the "**Promissory Note**").

1.6   Effective Date of Purchase and Sale.  The transfer of the title of the Membership Interest from Seller to Buyer hereunder shall occur and be effective as of the Closing Date.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the following are true and correct as of the date of this Agreement:

2.1   Titles.  Seller owns the legal and equitable titles of the Membership Interest.  Upon consummation of the transactions contemplated by this Agreement, Buyer shall acquire good, valid, and marketable title to the Membership Interest, free and clear of any liens, charges, or encumbrances.

2.2   Binding Obligation.  This Agreement is enforceable and binding on Seller in accordance with its terms except as may be limited by applicable bankruptcy, insolvency, moratorium, or similar laws now or hereafter in effect relating to or affecting creditors' rights generally or the availability of equitable remedies.

2.3   Litigation.  There is no claim, action, counterclaim, suit, litigation, or other legal, administrative, or tax proceeding, or any order, decree, or judgment, pending (or to Seller's knowledge (threatened, in writing) against or relating to Seller) with respect to the ownership or otherwise relating to the Membership Interest.  To Seller's Knowledge, no event occurred or circumstances exist that may give rise to, or serve as a basis for, any such action or proceeding.  As used herein, "**Seller's Knowledge**" means the actual or constructive knowledge of Seller.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that the following are true and correct as of the date of this Agreement:

3.1   Authorization and Binding Obligation.  This Agreement was duly authorized, executed, and delivered by Buyer and is enforceable and binding on the Buyer in accordance with its terms except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to or affecting creditors' rights generally or the availability of equitable remedies.

3.2   Absence of Conflicting Agreements or Required Consents.  The execution, delivery, and performance of this Agreement and the documents contemplated hereby (with or without the giving of notice, the lapse of time, or both) by Buyer: (a) does not and will not conflict with, result in a material breach or constitute a default under, or violate any applicable law, judgment, order, ordinance, injunction, decree, rule, regulation, or ruling of any court or

governmental authority; (b) does not and will not, either alone or with the giving of notice or the passage of time, or both, conflict with, constitute grounds for termination of, result in a material breach of, constitute a material default under, or accelerate, or permit the acceleration of any performance required by the terms of, any agreement, lease, instrument, license, or permit to which Buyer is a party or by which Buyer is bound.  No consent, approval, waiver, or authorization is required to be obtained by Buyer from any Person in connection with the execution, delivery, and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby, other than those already obtained by the time of Closing.

## ARTICLE 4
## INDEMNIFICATION

4.1     Survival of Representations, Warranties, and Covenants.  The representations and warranties of Seller and Buyer contained in this Agreement and any exhibit, certificate, or other document delivered pursuant hereto, or in connection with the transactions contemplated hereby shall survive the Closing indefinitely.  The covenants of Seller and Buyer set forth in this Agreement shall survive in accordance with their respective terms.

4.2     Indemnifications.  Each Party shall defend, indemnify, and hold harmless the other Party and their representatives, agents, attorneys, successors, and assigns from and against any and all losses incurred in investigating, preparing, or defending the foregoing asserted against, incurred, sustained, or suffered by any of the foregoing as a result of, arising out of or relating to: (i) any breach of any representation or warranty made by the indemnifying Party contained in this Agreement or any schedule, certificate, or other document delivered pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby (without giving effect to any limitations or qualifications thereto, including materiality, material adverse effect or knowledge); and (ii) any breach of any covenant or agreement by the indemnifying Party contained in this Agreement or any schedule, certificate, or other document delivered pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby.

## ARTICLE 5
## MISCELLANEOUS

5.1     Termination.  Prior to Closing, this Agreement may be unilaterally terminated by either Party by delivering written notice to the other Party.  Upon termination, this Agreement shall be void *ab initio*, and there shall be no liability on the part of any party hereto.

5.2     Due Diligence.  The Parties have entered into this Agreement and undertaken all obligations herein knowingly and voluntarily based on their due diligence investigation of the other Party and upon the representations and warranties of the other Party as expressly set forth herein, and upon no other representations, warranties, materials or information of any kind.

5.3     Further Assurances.  From time to time after the Closing, and for no further consideration, each of the Parties shall, and shall cause its respective affiliates to, execute, acknowledge, and deliver such assignments, transfers, consents, assumptions, and other documents and instruments and take such other actions as may be necessary or desirable to consummate and make effective the transactions contemplated by this Agreement.

5.4     Governing Law.  This Agreement, and the legal relationship between the Parties, shall be governed and construed in accordance with the laws of the State of New York without regard to conflicts-of-laws principles.  The Parties agree that all actions or proceedings arising out

of or in connection with this Agreement shall solely be litigated in the state courts of New York, and each Party irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction and venue of such courts. Each Party irrevocably waives any right it may have to assert the doctrine of *forum non conveniens* or to object to venue or jurisdiction to the extent any proceeding is brought in accordance with this Section 5.4 and consent to jurisdiction in State of New York. The Parties agree that any enforcement of this Agreement or any debt hereunder shall be undertaken in the state courts of New York; that neither Party will object to post-judgment actions being undertaken there; that any post-judgment deposition or discovery will be taken there; and that neither Party shall object to, and waives all objections to, domestication of any consent judgment or confession of judgment in any other state, territory, or nation-state.

5.5   Successors and Assigns. Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by any of the Parties hereto (whether by operation of law or otherwise) without the prior written consent of the other Parties (which consent shall not be unreasonably refused or delayed). Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, permitted assigns, heirs, executors, and administrators of the Parties hereto.

5.6   Entire Agreement; Amendment. This Agreement constitutes the full and entire understanding and agreement among the Parties with regard to the subjects hereof, and no Party shall be liable or bound to any other Person in any manner by any warranties, representations, or covenants except as specifically set forth herein. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged, or terminated other than by a written instrument signed by the Party against whom enforcement of any such amendment, waiver, discharge or termination is sought.

5.7   Notices, etc. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered by hand, mailed by registered or certified mail, postage prepaid, transmitted by facsimile transmission (which is confirmed), transmitted by electronic mail in the form of a PDF file (which transmission is confirmed or followed by a copy transmitted by another permitted method under this Section 5.7), or sent by an overnight courier service, such as UPS, to the Parties last known address or at such other address as specified by like notice.

5.8   Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which together shall constitute one instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or by electronic mail in a PDF file shall be effective as delivery of a manually executed counterpart of this Agreement.

5.9   Severability. In the event that any provision of this Agreement becomes, or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision, which shall be replaced with an enforceable provision closest in intent and economic effect as the severed provision.

5.10   Headings. The headings and subheadings used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

IN WITNESS WHEREOF, the undersigned have caused this Membership Interest Purchase Agreement to be duly executed and delivered effective as of the date first written above.

**BUYER**

THE SCHNAPP FAMILY BUSINESS TRUST
    By: LAC Services I, Inc., Trustee

By: *jonathan bander*
    Name: Jonathan Bander
    Its President

**SELLER**:

By: _____
Jonathan Schnapp

5

**Exhibit A**
**Assignment of Membership Interest**

## Assignment of Membership Interest

This Assignment of Membership Interest (this "**Assignment**"), dated and effective as of _____, 2025, is by and between Jonathan Schnapp (the "**Assignor**"), and LAC Services I, Inc. as Trustee of THE SCHNAPP FAMILY BUSINESS TRUST (the "**Assignee**"). This Assignment is executed and delivered by the parties pursuant to that certain Membership Interest Purchase Agreement dated as of even day herewith (the "**MIPA**"), by and between Assignor and Assignee. Capitalized terms used in this Agreement but not defined herein shall have the meanings ascribed to them in the MIPA.

**WHEREAS**, Assignor owns Fifty Percent (50%) of membership interest in Biscuits and Tangs, LLC, a New York limited liability company (the "**Company**"); and

**WHEREAS**, on even day herewith, the parties executed the MIPA, whereby Assignee agreed to purchase all of Assignor's membership interest in the Company from Assignor, and Assignor irrevocably agreed to sell such membership interest to Assignee.

**NOW, THEREFORE**,

Assignors hereby transfer, assign and deliver to Assignee all of Assignors' membership interest in the Company, comprising of Fifty Percent (50%) of membership interest in the Company, as of the date first above written.

IN WITNESS THEREOF, the undersigned have hereunto set their hands and seal as of the date first above written**.**

**Assignor**:                                                            **Assignee**:

                                                                                        THE SCHNAPP FAMILY BUSINESS TRUST
                                                                                            By: LAC Services I, Inc., Trustee

By: _____           By: _____
    Jonathan Schnapp                                                    Name: Jonathan Bander,
                                                                                            Its President

**Exhibit B**
**Promissory Note**

## Promissory Note

$1,100,000.00                                                                                   As of February 17, 2025

FOR VALUE RECEIVED, LAC Services I, Inc. as Trustee of THE SCHNAPP FAMILY BUSINESS TRUST (the "**Maker**"), hereby promises to pay the order of Jonathan Schnapp (the "**Holder**"), at Holder's address as set forth in Section 7 below, or at such other place as Holder may designate to Maker in writing from time to time, the principal sum of one million one hundred thousand dollars ($1,100,000.00) or such amount thereof as is then due and payable, subject to and in accordance with the terms and conditions set forth in this promissory note (the "**Note**") (Maker and Holder individually referred to as the "**Party**" and collectively referred to as the "**Parties**"). The Note is effective as of the date first written above (the "**Effective Date**").

Reference is hereby made to that certain Membership Interest Purchase Agreement (the "**MIPA**") entered into on even date herewith by and between Maker and Holder, each respectively referred to as the "Buyer" and the "Seller" in the MIPA. Capitalized, undefined terms have the meaning ascribed to them in the MIPA. Pursuant to the MIPA, Maker has an obligation to pay the Purchase Price to Holder in consideration for the membership interest it acquired from Holder. The Parties hereby execute this Note to memorize Buyer's obligations to pay the Purchase Price that equals the principal sum of this Note.

1. Payment Provisions

    1.1 Interest. The outstanding principal balance of this Note shall bear interest per annum, at the long-term applicable federal rate of the month of the Effective Date, which is four and eighty-six hundredth of a percent (4.86%), compounded annually, computed on the basis of a 365-day year, on actual days elapsed.

    1.2 Payment and Maturity. Accrued, unpaid interest on the outstanding principal balance shall be paid on each anniversary of the Effective Date, provided, at Maker's option, the interest due may be rolled over and added to the outstanding principal balance which bears interest pursuant to Section 1.1 above. The entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon, shall be due and payable the day before the thirtieth (30th) anniversary of the Effective Date.

    1.3 Prepayment. This Note may be prepaid at any time in whole or in part without penalty or premium and without the prior consent of Holder.

2. Default. Should any installment of principal or interest not be paid within ten (10) Business Days (as defined below) of the date when due, Holder may, at Holder's sole option, declare the then remaining outstanding balance of this Note to be, and the same shall thereupon become, immediately due and payable.

3. Interest upon Default. Upon default, interest shall accrue on the outstanding principal balance of this Note from the date of such default and for so long as such default continues, at the rate of five percent (5%) per annum.

4. Savings Clause. Notwithstanding any other provision of this Note or of any other agreement or instrument to which Maker and Holder are parties, nothing herein contained or therein contained shall require the payment of any interest, expense, or other charge by Maker which, when aggregated with all other interest, expenses, and charges directly or indirectly paid

by Maker or imposed by Holder as a condition to the extension of this credit, shall exceed the highest lawful rate permissible under any law applicable thereto (the "Highest Lawful Rate"), including, without limitation, any applicable usury statute. If, but for this provision, this Note or any other such agreement or instrument would require any such payment in excess of such Highest Lawful Rate, this Note and such other agreement or instrument shall automatically be deemed amended so that all interest, charges, expenses, and other payments required hereunder or thereunder or so imposed, individually and in the aggregate, shall be equal to, but no greater than, the Highest Lawful Rate therefor. If from any circumstances Holder should ever receive an amount which, but for this provision, would constitute an unlawful payment hereunder or thereunder, then, *ipso facto*, such amount shall be applied to the reduction of the outstanding principal balance of this Note and not to the payment of interest, expenses and charges.

5.  Time of the Essence. Time is of the essence under this Note.

6.  Amendment. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change, or affect the original liability of Maker under this Note, either in whole or in part, unless Holder agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the Party against whom enforcement of any waiver, change, modification, or discharge is sought. No delay on the part of the Holder of this Note in the exercise of any power or right under this Note shall operate as a waiver hereof or thereof, nor shall a single or partial exercise of any other power or right.

7.  Notices. All notices and other communications shall be given in the same way set forth in the APA.

8.  Binding Effect; Definitions. This Note shall be binding upon Maker and the Maker's successors and permitted assigns and shall inure to the benefit of the Holder of this Note and the Holder's successors and permitted assigns. As used herein, (i) the terms "Maker" and "Holder" shall be deemed to include their respective heirs, successors, legal representatives, and assigns, whether by voluntary action of the Parties or by operation of law, (ii) and the term "Business Day" shall mean a day other than Saturday, Sunday, or any day on which banks located in the State of New York are authorized or obligated to close.

9.  Headings. The paragraph headings contained in this Note are for reference purposes only and shall not affect in any way the meaning or interpretation of this Note.

10. Severability. If any provision of this Note is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Note will remain in full force and effect. Any provision of this Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

11. Governing Law. This Note shall be governed by and construed in accordance with the internal laws of the State of New York without regard to its conflicts of laws principles.

IN WITNESS WHEREOF, Maker has caused this Note to be executed as of the Effective Date.

**Maker**:

THE SCHNAPP FAMILY BUSINESS TRUST
    By: LAC Services I, Inc., Trustee


By: _____
    Name: Jonathan Bander
    Its President

# Audit of 'Membership Interest Purchase Agreement.pdf'



## This document is a  FINALIZED  sign request

| | |
|---|---|
| From | Douglas Stein <dstein@steinlawllc.com> |
| File Owner | Stein Law LLC |
| Initialized | Feb 17, 2025 @ 2:06 PM EST ✓ 734e7427 |
| Finalized | Feb 18, 2025 @ 11:37 AM EST ✓ 4e58e616 |
| Unique Url | https://dochub.com/stein-law-llc/gp5nv1EK7arOoxjwGlbo0J/membership-interest-purchase-agreement-pdf |
| Page Count | 11 |

# Signers

**J** **jonathan@royalpalmsshuffle.com**  FINALIZED
Signer - jonathan-fmqa0b

✓ Verified IP  2603:7000:8945:bc00:28e2:fc50:b81e:d46d      ✓ Verified consent to Esign
✓ Verified geolocation  40°41′17″N 73°59′36″W (880.836 m)



Document "after" snapshot:  Feb 18, 2025 @ 11:37 AM EST  ✓ 4e58e616

## Assigned Fields

| Value | Type | Req. | Page # | Updated |
|---|---|---|---|---|
|  | Signature Field | 🔒 | 5 | Feb 18, 2025 @ 11:18 AM EST |

 **jon@experitycpa.com** `FINALIZED`
Signer - jon-rv9e0w

✓ Verified IP  34.206.241.163, 2600:1017:b828:e45b:a9e3:7228:351f:59c    ✓ Verified consent to Esign
✓ Verified geolocation  40°45′26″N 73°58′19″W (45.752 m)



Document "before" snapshot:  Feb 18, 2025 @11:37 AM EST  ✓ 4e58e616

## Assigned Fields

| Value | Type | Req. | Page # | Updated |
|---|---|---|---|---|
| *jonathan bander* | Signature Field | 🔒 | 5 | Feb 17, 2025 @ 2:26 PM EST |

## Event History

**Feb 17, 2025**

| 2:04 PM | ＋ Document created | dstein@steinlawllc.com created the document |
|---|---|---|
| 2:05 PM | ✎ Modified | dstein@steinlawllc.com modified the document<br>IP 24.99.101.181, Chrome 132, Windows 10.0 |
| 2:06 PM | 📄 Sign request created | dstein@steinlawllc.com initialized a sign request with the document<br>Verified snapshot ✓ 734e7427<br>IP 24.99.101.181, Chrome 132, Windows 10.0 |
| 2:06 PM | ✉ Email sent | jonathan@royalpalmsshuffle.com was notified by email<br>Email Delivery Status: `DELIVERED` |
| 2:06 PM | ✉ Email sent | jon@experitycpa.com was notified by email<br>Email Delivery Status: `DELIVERED` |
| 2:26 PM | ✉ Email read | jon@experitycpa.com opened the notification email |
| 2:26 PM | 👁 Viewed | jon@experitycpa.com viewed the document<br>IP 34.206.241.163, Safari 16, Ios 16.2 |
| 2:26 PM | ☑ Consented to esign | jon@experitycpa.com consented to esign<br>IP 2600:1017:b828:e45b:a9e3:7228:351f:59c, Safari 16, Ios 16.2 |

| | | |
|---|---|---|
| 2:26 PM | Location verified | jon@experitycpa.com's location was verified<br>IP 2600:1017:b828:e45b:a9e3:7228:351f:59c, Safari 16, Ios 16.2<br>40°45′26″N 73°58′19″W (45.752 m) |
| 2:26 PM | Modified | jon@experitycpa.com modified the document<br>IP 2600:1017:b828:e45b:a9e3:7228:351f:59c, Safari 16, Ios 16.2 |
| 2:26 PM | Finalized | jon@experitycpa.com finalized their changes<br>IP 2600:1017:b828:e45b:a9e3:7228:351f:59c, Safari 16, Ios 16.2 |
| 3:29 PM | Email read | jonathan@royalpalmsshuffle.com opened the notification email |

Feb 18, 2025

| | | |
|---|---|---|
| 11:18 AM | Viewed | jonathan@royalpalmsshuffle.com viewed the document<br>IP 2603:7000:8945:bc00:28e2:fc50:b81e:d46d, Chrome 131, Mac 10.15.7 |
| 11:18 AM | Consented to esign | jonathan@royalpalmsshuffle.com consented to esign<br>IP 2603:7000:8945:bc00:28e2:fc50:b81e:d46d, Chrome 131, Mac 10.15.7 |
| 11:18 AM | Location verified | jonathan@royalpalmsshuffle.com's location was verified<br>IP 2603:7000:8945:bc00:28e2:fc50:b81e:d46d, Chrome 131, Mac 10.15.7<br>40°41′17″N 73°59′36″W (880.836 m) |
| 11:18 AM | Modified | jonathan@royalpalmsshuffle.com modified the document<br>IP 2603:7000:8945:bc00:28e2:fc50:b81e:d46d, Chrome 131, Mac 10.15.7 |
| 11:37 AM | Sign request finalized | jonathan@royalpalmsshuffle.com finalized the sign request for the document<br>Verified snapshot  4e58e616 |