UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ASHLEY ALBERT,

                           Plaintiffs,

    v.

JONATHAN SCHNAPP and LAC Services I,  Inc., as
Trustee of the Schnapp Family Business Trust,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' ANSWER
WITH VERIFIED
<u>COUNTERCLAIMS</u>**

Civil Action No. 1:25-cv-3013

JURY TRIAL DEMANDED

Defendant Jonathan Schnapp, by his attorneys, Garfunkel Wild, P.C., and LAC Services I,

Inc., as Trustee of the Schnapp Family Business Trust ("LAC") also by Garfunkel Wild, P.C. (but

solely in its alleged capacity as Trustee of the Schnapp Family Business Trust) for their Answer

to the Complaint filed by Plaintiff Ashley Albert on May 30, 2025 (the "Complaint"), allege as

follows:

1.      Deny knowledge or information sufficient to form a belief as to the truth of the

allegations made in paragraph 1 of the Complaint, except admit that Ms. Albert and Mr. Schnapp

are co-owners of Biscuits & Tangs, LLC (the "Company"), the Company is a part owner of two

shuffleboard clubs located in Brooklyn and Chicago, and the shuffleboard clubs were successful

under the leadership of Mr. Schnapp.

2.      Deny knowledge or information sufficient to form a belief as to the truth of the

allegations made in paragraph 2 of the Complaint, except admit that Ms. Albert and Mr. Schnapp

are co-owners of the Company that manages and controls two entities that own shuffleboard clubs.

3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 3 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

4.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in 4 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

5.      Deny the truth of the allegations made in 5 of the Complaint, except admit that Mr. Schnapp proposed an amendment to the Operating Agreement where he would receive the Management Fee, primarily because he was the only member actively managing the business due in large part to Plaintiff's inability or unwillingness to do so.

6.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 6 of the Complaint, except admit that the Buy/Sell provision was invoked by Mr. Schnapp using a price of $1.4 million and that he requested that he get a higher percentage of the Management Fee.

7.      Deny the truth of the allegations made in paragraph 7 of the Complaint.

8.      Deny the truth of the allegations made in paragraph 8 of the Complaint, except admit that the Company made a 2024 fourth quarter distribution.

9.      Deny the truth of the allegations made in paragraph 9 of the Complaint, except admit that the 2024 fourth quarter distribution occurred after the Buy/Sell provision was invoked.

10.      Deny the truth of the allegations made in paragraph 10 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof, and that Plaintiff was required to undertake certain actions to ensure Mr. Schnapp's total interest could be transferred.

4898-4785-8513v.2

11. Deny the truth of the allegations made in paragraph 11 of the Complaint, except admit that Mr. Schnapp took the correct position that he remained a Member at all times and Mr. Schnapp considered an estate planning transaction compliant with the Operating Agreement at a certain point in time.

12. Deny the truth of the allegations made in paragraph 12 of the Complaint.

13. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 13 of the Complaint, which assert legal conclusions to which no response is necessary, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

14. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 14 of the Complaint, except admit that Ms. Albert was a co-founder.

15. In response to the allegations made in paragraph 15 of the Complaint, Mr. Schnapp admits that he resides in Brooklyn, New York and co-founded the Company.

16. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 16 of the Complaint, except admit that LAC was identified on estate documents as trustee for the Schnapp Family Business Trust.

17. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 17 of the Complaint, which assert legal conclusions to which no response is necessary, except respectfully refer the Court to 28 U.S.C. § 1332 for the true and correct terms, and legal effects if any, thereof.

18. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 18 of the Complaint, which assert legal conclusions to which no response is necessary, except admit that Mr. Schnapp resides in Brooklyn.

4898-4785-8513v.2

19.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 19 of the Complaint, which assert legal conclusions to which no response is necessary, except admit that Ms. Schnapp resides in Brooklyn and the Company has operations in Brooklyn.

20.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 20 of the Complaint, except admit that the Company was formed in 2012 and respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

21.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 21 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

22.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 22 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

23.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 23 of the Complaint, except respectfully refer the Court to the Operating Agreement and the subsidiaries' operating agreements for the true and correct terms, and legal effects if any, thereof.

24.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 24 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

4898-4785-8513v.2

25.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 25 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

26.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 26 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

27.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 27 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

28.     Deny the truth of the allegations made in paragraph 28 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

29.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 29 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

30.     Deny the truth of the allegations made in paragraph 30 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

31.     Deny the truth of the allegations made in paragraph 31 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

4898-4785-8513v.2

32. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 32 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

33. Deny the truth of the allegations made in paragraph 33 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

34. Deny the truth of the allegations made in paragraph 34 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

35. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 35 of the Complaint, except admit that Mr. Schnapp worked full-time managing the clubs, which routinely consisted of eighty hour work weeks, Ms. Albert was focused on other ventures that were not related to the Company, and that she had an apartment that was close to the Brooklyn club.

36. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 36 of the Complaint, except admit that Ms. Albert decided to withdraw from active management of the Company, refused to assist with other tasks and roles related to the Company, and Mr. Schnapp was forced to manage operations.

37. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 37 of the Complaint, except admit that the parties had been splitting the management fee since 2012 and that Mr. Schnapp asked for a greater share of the management fee given that he was forced to manage the clubs with no genuine or competent assistance from Ms. Albert.

4898-4785-8513v.2

38.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 38 of the Complaint, except admit that Mr. Schnapp wanted to buy out Ms. Albert at a certain point in time.

39.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 39 of the Complaint, except admit that Mr. Schnapp said that Ms. Albert should try to find a buyer to determine the market value of the Company.

40.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 40 of the Complaint, except admit that, around that time, Mr. Schnapp informed staff that he needed to reduce his eighty-hour workweek to a more manageable schedule for personal reasons.

41.     Deny the truth of the allegations made in paragraph 41 of the Complaint, except admit that Mr. Schnapp triggered the Buy/Sell Provision.

42.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 42 of the Complaint, except respectfully refer the Court to the "proposed amendment" for the true and correct terms, and legal effects if any, thereof.

43.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 43 of the Complaint, except admit that Plaintiff did not firmly agree to the amendment to the Operating Agreement.

44.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 44 of the Complaint, except admit that both parties removed $100,000 from the accounts related to the management fee and mediation and respectfully refer the Court to the email for the true and correct terms, and legal effects if any, thereof.

4898-4785-8513v.2

45. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 45 of the Complaint, except respectfully refer the Court to the December 14, 2025 email for the true and correct terms, and legal effects if any, thereof, which was transmitted on December 14, 2025.

46. Deny the truth of the allegations made in paragraph 46 of the Complaint, except respectfully refer the Court to the Buy/Sell Offer and email for the true and correct terms, and legal effects if any, thereof.

47. Deny the truth of the allegations made in paragraph 47 of the Complaint, except respectfully refer the Court to the email for the true and correct terms, and legal effects if any, thereof.

48. Deny the truth of the allegations made in paragraph 48 of the Complaint, except respectfully refer the Court to the non-compliant buy-out proposal Ms. Albert sent as a counteroffer for the true and correct terms, and legal effects if any, thereof.

49. Deny the truth of the allegations made in paragraph 49 of the Complaint, except respectfully refer the Court to the email for the true and correct terms, and legal effects if any, thereof.

50. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 50 of the Complaint, except respectfully refer the Court to the text message for the true and correct terms, and legal effects if any, thereof.

51. Deny the truth of the allegations made in paragraph 51 of the Complaint.

52. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 52 of the Complaint, except respectfully refer the Court to the correspondence for the true and correct terms, and legal effects if any, thereof.

4898-4785-8513v.2

53. Deny the truth of the allegations made in paragraph 53 of the Complaint, except respectfully refer the Court to the letter for the true and correct terms, and legal effects if any, thereof.

54. Deny the truth of the allegations made in paragraph 54 of the Complaint.

55. Deny the truth of the allegations made in paragraph 55 of the Complaint.

56. Deny the truth of the allegations made in paragraph 56 of the Complaint.

57. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 57 of the Complaint, except respectfully refer the Court to the email correspondence mentioned in paragraph 57 for the true and correct terms, and legal effects if any, thereof.

58. Deny the truth of the allegations made in paragraph 58 of the Complaint, except admit that Mr. Schnapp took possession of the deposit, while reserving all rights, on the good faith belief that the transaction would close to settle this dispute.

59. Deny the truth of the allegations made in paragraph 59 of the Complaint.

60. Deny the truth of the allegations made in paragraph 60 of the Complaint, except admit that Royal Palms Shuffleboard Club, LLC and Royal Palms Chicago LLC made distributions to the investors in the clubs and other ordinary course of business transfers.

61. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 61 of the Complaint, except admit that Royal Palms Shuffleboard Club, LLC and Royal Palms Chicago LLC made distributions to the investors in the clubs and other ordinary course of business transfers.

4898-4785-8513v.2

62.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 62 of the Complaint, except admit that both parties and investors received 2024 fourth quarter distributions.

63.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 63 of the Complaint, except admit that both parties received 2024 fourth quarter distributions.

64.     Deny to the truth of the allegations made in paragraph 64 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

65.     Deny to the truth of the allegations made in paragraph 65 of the Complaint.

66.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 66 of the Complaint, except respectfully refer the Court to the "offer" for the true and correct terms, and legal effects if any, thereof, and affirmatively object to the improper inclusion of settlement negotiations in the Complaint.

67.     Deny to the truth of the allegations made in paragraph 67 of the Complaint, except admit that Plaintiff's request for cash adjustment is frivolous.

68.     Deny the truth of the allegations made in paragraph 68 of the Complaint, except admit that both Parties received the same distributions.

69.     Deny the truth of the allegations made in paragraph 69 of the Complaint, except respectfully refer the Court to the trust documents referenced in paragraph 69 for the true and correct terms, and legal effects if any, thereof, and admit that Mr. Schnapp took certain estate planning steps in the event that the deal would close.

4898-4785-8513v.2

70.     Deny the truth of the allegations made in paragraph 70 of the Complaint, except respectfully refer the Court to the trust documents referenced in paragraph 70 for the true and correct terms, and legal effects if any, thereof.

71.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 71 of the Complaint, except admit that Ms. Albert made a failed attempt to remove Mr. Schnapp as a manager of the Company.

72.     Deny the truth of the allegations made in paragraph 72 of the Complaint, except admit that Mr. Schnapp negotiated the closing of the transaction in good faith.

73.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 73 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof, and admit that Mr. Schnapp took steps for estate planning purposes in the event that the deal would close.

74.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 74 of the Complaint, except admit that during the negotiation, Mr. Schnapp requested that the full amount stated in the Buy/Sell Offer be paid, that he be released from the clubs' leases if Ms. Albert was to hold the entire interest in the Company, that there be a mutual release related to the parties' known conduct prior to closing, the Company continue to pay for the Company apartment that both parties used for the Chicago club, and that Ms. Albert not sell Mr. Schnapp's interest prior to closing.

75.     Deny the truth of the allegations made in paragraph 75 of the Complaint, except admit that Mr. Schnapp as the purchaser would be "simple" and "straightforward" because, among other things, Ms. Albert had the ability to transfer her entire interest simply (since she signed no

contingent liability documents) and respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

76. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 76, except refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof, and admit that all of the closing date allegations are erroneous due to the Plaintiff's rejection of the offer to sell (among other reasons).

77. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 77 of the Complaint, except admit that Mr. Schnapp took possession of the deposit, while reserving all rights, on the belief that Ms. Albert would act in good faith to close the deal.

78. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 78 of the Complaint, except admit that Ms. Albert refused to confirm that she would transfer the deposit.

79. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 79 of the Complaint, except admit that Mr. Schnapp acted in good faith to negotiate and close the transaction and that Mr. Schnapp did not return the deposit.

80. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 80 of the Complaint.

81. Deny the truth of the allegations made in paragraph 81 of the Complaint, except refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

4898-4785-8513v.2

82. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 82 of the Complaint, except admit that certain terms were discussed in the weeks prior to March 12, 2025.

83. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 83, except refer the Court to the communications with the proposed language alleged in paragraph 83 for the true and correct terms, and legal effects if any, thereof.

84. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 84 of the Complaint, except admit that Mr. Schnapp had attempted to create an estate planning vehicle to assist in the transfer.

85. Deny the truth of the allegations made in paragraph 85 of the Complaint.

86. Deny the truth of the allegations made in paragraph 86 of the Complaint.

87. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 87 of the Complaint, except admit that Ms. Albert inappropriately attempted (but failed) to remove Mr. Schnapp as manager.

88. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 88 of the Complaint, except admit that Ms. Albert was required to remove Mr. Schnapp from guaranties related to the clubs' leases in order to allow an unencumbered transfer of interest.

89. Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 89 of the Complaint, except admit upon information and belief that Ms. Albert did have discussions with the landlord.

4898-4785-8513v.2

90.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 90 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

91.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 91 of the Complaint, except admit that the Company had the funds to make the additional security deposit.

92.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 92 of the Complaint, except admit that the trust transaction was rescinded.

93.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 93 of the Complaint, except respectfully refer the Court to the correspondence referenced in paragraph 93 of the Complaint for the true and correct terms, and legal effects if any, thereof.

94.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 94 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

95.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 95 of the Complaint, except admit that Mr. Schnapp requested a mutual release and that the Company continue to pay for the Chicago apartment, which was used for management of the Chicago club and historically paid by the Company.

96.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 96 of the Complaint, except admit that Mr. Schnapp requested that the Company make its first quarter management fee from the clubs.

4898-4785-8513v.2

97.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 97 of the Complaint, except admit that Ms. Albert's counsel said in a May 20, 2025 email "The Amendment is with the Brooklyn landlord for signature, and we expect that to be signed imminently—and will share it with you when available.  As such, we will be in a position to close under the MIPA very soon."  There was no mention of a May 31 deadline.

98.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 98 of the Complaint, except respectfully refer the Court to the correspondence referenced in paragraph 98 for the true and correct terms, and legal effects if any, thereof, as for the May 23, 2025 email, it was sent on Friday afternoon before the Memorial Day holiday and the attached release was not seen until the following week.

99.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 99 of the Complaint, except respectfully refer the Court to the correspondence referenced in paragraph 99 of the Complaint for the true and correct terms, and legal effects if any, thereof, and admit that solely for the purpose of settling the dispute, Mr. Schnapp was willing to settle the transaction to avoid litigation, without the Company covering the Chicago apartment lease and with Ms. Albert wrongfully withholding half the management fee.

100.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 100 of the Complaint, except admit that certain document tweaks were required to fix incorrect wording used by Ms. Albert that were already agreed to by the parties.

101.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 101 of the Complaint, except admit that Mr. Schnapp submitted

15

executed closing documents to Ms. Albert, which codified the parties' agreement. Ms. Albert then refused to close.

102.     Repeat and re-allege each and every one of their answers to the allegations set forth above as if fully set forth herein.

103.     In response to paragraph 103 of the Complaint, respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

104.     Deny the truth of the allegations made in paragraph 104 of the Complaint.

105.     Deny the truth of the allegations made in paragraph 105 of the Complaint, except respectfully refer the Court to the Operating Agreement for the true and correct terms, and legal effects if any, thereof.

106.     Deny the truth of the allegations made in paragraph 106 of the Complaint.

107.     Deny the truth of the allegations made in paragraph 107 of the Complaint.

108.     Repeat and re-allege the answers to the allegations set forth above as if fully set forth herein.

109.     Deny the truth of the allegations made in paragraph 109 of the Complaint, except respectfully refer the Court to the correspondence for the true and correct terms, and legal effects if any, thereof.

110.     Deny the truth of the allegations made in paragraph 110 of the Complaint, except admit Mr. Schnapp is still a Manager.

111.     Deny the truth of the allegations made in paragraph 111 of the Complaint, except admit Mr. Schnapp is still a Manager.

112.     Deny the truth of the allegations made in paragraph 112 of the Complaint.

4898-4785-8513v.2

113.    Neither admit nor deny the statements made in paragraph 113 of the Complaint, as they assert a legal conclusion to which no response is necessary.  To the extent that the statements made in paragraph 113 of the Complaint contain any allegations to which a response is needed, Defendants deny the truth of the allegations made in paragraph 113 of the Complaint.

114.    Neither admit nor deny the statements made in paragraph 114 of the Complaint as they assert a legal conclusion to which no response is necessary.  To the extent that the statements made in paragraph 114 of the Complaint contain any allegations to which a response is needed, Defendants deny the truth of the allegations made in paragraph 114 of the Complaint.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

115.    Plaintiff's claims are barred by the Plaintiff's failure to comply with the terms of the parties' Operating Agreement, including material conditions precedent.

## SECOND AFFIRMATIVE DEFENSE

116.    Plaintiff's claims are barred by the Plaintiff's prior material breaches of the parties' Operating Agreement,

## THIRD AFFIRMATIVE DEFENSE

117.    The Complaint must be dismissed as a result of Plaintiff's unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

118.    Under the Operating Agreement, all disputes concerning the purchase price must be decided by the Company's accountant.

## FIFTH AFFIRMATVE DEFENSE

119.    The claims are barred due to the defenses of duress, estoppel, and waiver.

4898-4785-8513v.2

## SIXTH AFFIRMATIVE DEFENSE

120. The claims are barred due the misrepresentation by Plaintiff prior to March 12, 2025 that the landlord for the Brooklyn facility was willing to replace Mr. Schnapp as the personal guarantor on the lease with Ms. Albert.

## SEVENTH AFFIRMATIVE DEFENSE

121. The claims are barred due the fraudulent misrepresentation by Plaintiff prior to March 12, 2025 that the Ms. Albert was willing to remove Mr. Schnapp as the personal guarantor on the Chicago lease, when in actuality she was only willing to release Mr. Schnapp if he stepped down as manager of a separate company that was unrelated to the transaction.

## EIGHTH AFFIRMTIVE DEFENSE

122. The claims are barred due Plaintiff's failure to mitigate.

\* \* \* \*

Mr. Schnapp reserves the right to assert, at a later date, any and all affirmative defenses not asserted herein, which further investigation or discovery may prove available to Mr. Schnapp as against any claims asserted against it in this matter.

\* \* \* \*

## COUNTERCLAIMS

1. Counterclaim-Plaintiff Jonathan Schnapp, by and through his attorneys, as and for his Verified Counterclaims against Counterclaim-Defendant Ashley Albert, alleges as follows:

## NATURE OF THE ACTION

2. These counterclaims arise from a deliberate and sustained pattern of obstruction, bad faith, and contractual breach by Ms. Albert in connection with the enforcement of the Buy/Sell provision in the Operating Agreement governing Biscuits & Tangs, LLC (the "Company"). A copy

4898-4785-8513v.2

of the Operating Agreement is attached as Exhibit 1. The Company serves as the managing member and majority equity owner of two shuffleboard venues—Royal Palms Brooklyn and Royal Palms Chicago—and is structured to receive management fees and equity distributions from each.

3.     In December 2024, Mr. Schnapp, the Company's co-founder, properly invoked the deadlock resolution mechanism in the Operating Agreement by offering to either purchase Ms. Albert's interest in the Company or sell his own to her at a price of $1.4 million.

4.     Under the Operating Agreement, Ms. Albert had thirty business days to respond by either: (i) accepting the offer with a non-refundable 10% deposit, or (ii) be deemed to have elected to sell.

5.     What Ms. Albert did in response makes this a straightforward breach of contract case. She did not deliver the required deposit, despite a clear obligation to do so. While she offered to pay the full amount at closing, that option is not an option permitted by the Operating Agreement. Making matters worse, Ms. Albert included within her response several contingencies, such as the ability obtain financing.

6.     After some deliberation, and in order to avoid litigation and allow for a negotiated resolution, Mr. Schnapp agreed to attempt to proceed with a sale of his interest. At all times, however, he expressly reserved his right to enforce Ms. Albert's obligation to sell under the Operating Agreement.

7.     Ms. Albert did not negotiate in good faith. Instead, she obstructed closing, imposed extracontractual demands, delayed the execution of final documents, and fabricated claims to pursue post-closing litigation against Mr. Schnapp.

8.     For example, although the Operating Agreement required her to accept Mr. Schnapp's total interest in the Company, she refused to assume the guaranty on the lease for the

Brooklyn venue. As part of building the Company, Mr. Schnapp signed the guaranty since the landlord reasonably required a personal guaranty. By refusing to have Mr. Schnapp released, for all intent and purpose, Ms. Albert attempted to take over the Company while leaving Mr. Schnapp personally liable for a multimillion-dollar obligation. Despite claiming to have elected to purchase the Company – *i.e.* its assets and liabilities, including the contingent liabilities – Ms. Albert still refused to fulfill this basic and customary closing condition: releasing Mr. Schnapp from Company related guarantees.

9.      When Ms. Albert finally realized the Membership Interest could not be transferred without her assuming the guaranty, she approached the landlord. Upon information and belief, her request for substitution was rejected due to her lack of operational experience and insufficient financial credentials. Although the landlord later reconsidered, it conditioned approval on an increased security deposit and additional guarantor.

10.     Ms. Albert's conduct concerning the Chicago lease was equally improper. The parties co-owned a second company – Silent Captain LLC – which owns real estate in Chicago. Royal Palms Chicago leases a Silent Captain LLC building. As with the Brooklyn property, Ms. Albert was required to have Mr. Schnapp released from that lease in order for his Membership Interest to be transferred.

11.     When an unsigned release was produced within a few days of the closing, however, it required Mr. Schnapp resign as manager of the real estate company—a demand never raised in the months of negotiation and wholly unrelated to the Buy/Sell process.

12.     Of course, the release with the surreptitiously inserted clause was not acceptable. Thereafter, when an executed release was sent to Ms. Albert concerning the Chicago venue that did not contain Mr. Schnapp's resignation from Silent Captain, she refused to sign the release.

13.     Meanwhile, acting on the good-faith belief that closing was imminent, Mr. Schnapp facilitated a transition of access to key company systems. Rather than reciprocate, Ms. Albert used this opportunity to lock him out of critical business infrastructure, including email accounts, scheduling software, website management tools, and social media platforms.

14.     She then took the extraordinary and baseless step of attempting to remove Mr. Schnapp as a Manager based on the fiction that a permitted estate-planning transfer of his economic interest in the Company stripped him of voting rights. This position is directly contradicted by the Operating Agreement, which allows such transfers.

15.     While still purporting to work toward closing, Ms. Albert began making unilateral "Major Decisions" in direct violation of Section 6.2 of the Operating Agreement. These actions included hiring new senior executives to roles that had never previously existed, materially altering the Company's food and beverage model, initiating significant unapproved renovations, and publicly announcing a new governance structure—all without having completed the transaction or acquired controlling ownership.

16.     Because Ms. Albert resides in California and rarely visits the venues, she also appointed a new Director of Operations—believed to be a future equity partner—to manage day-to-day operations and entrench her control of the Company despite her failure to close.

17.     These actions occurred while the Buy/Sell process remained incomplete.

18.     Compounding matters, although the delay in closing was the result of Ms. Albert's own failure to obtain substitution on the Brooklyn lease, she stopped collecting management fees from the venues. Such fees were how the two owners were paid, as neither drew a salary. Once the fees were transferred to the Company, they were distributed 50-50. This failure to transfer

funds was Ms. Albert's attempt to avoid sharing those proceeds with Mr. Schnapp, who remained a Member under the Operating Agreement and entitled to his share.

19. Ms. Albert also disparaged Mr. Schnapp to investors and others, falsely blaming him for operational challenges. Yet under her exclusive and unauthorized control—the Company's financial performance cratered. Upon information and belief, between March and May 2025, Royal Palms Brooklyn and Chicago suffered a combined operating loss approximately $15,000—compared to over $200,000 in profits during the same period in 2024. These results speak directly to the consequences of Ms. Albert's mismanagement.

20. Through these counterclaims, Mr. Schnapp seeks to enforce Ms. Albert to complete the Buy/Sell and sell her interest to him. Also, Mr. Schnapp seeks to hold Ms. Albert accountable for her repeated contractual breaches, failure to act in good faith, and the significant damage she has caused to him personally and to the business they co-founded.

21. Ms. Albert's attempt to forcibly exclude her longtime business partner—while leaving him personally liable and professionally disenfranchised—is not only inequitable, it exemplifies bad-faith conduct that violates both the letter and spirit of the Operating Agreement.

## THE PARTIES

22. Counterclaim-Plaintiff/Defendant Jonathan Schnapp is a resident of Brooklyn, New York. He is a co-founder and 50% Member and Manager of Biscuits & Tangs, LLC.

23. Counterclaim-Defendant/Plaintiff Ashley Albert is a resident of California. She is a co-founder and 50% Member and Manager of Biscuits & Tangs, LLC.

4898-4785-8513v.2

## FACTS

### Formation And Growth Of The RP Shuffleboard Clubs

24.     Jonathan Schnapp and Ashley Albert were longtime friends with a shared passion for creativity, community engagement, and the revival of classic leisure activities—particularly shuffleboard.

25.     Acting on this passion, in 2012, Mr. Schnapp and Ms. Albert co-founded Biscuits & Tangs, LLC to serve as the managing member and partial equity owner of a new business venture in Brooklyn: The Royal Palms Shuffleboard Club, LLC ("RP Brooklyn").

26.     The Brooklyn location—an ambitious, ground-up project—quickly captured the imagination of local patrons with its innovative concept, bringing shuffleboard out of retirement homes and into a dynamic nightlife setting.

27.     Mr. Schnapp led the development and daily operations of RP Brooklyn, leveraging his creative background and tireless work ethic to build a successful brand.

28.     Building on the momentum of RP Brooklyn, the Company expanded in 2018 to open a second location: Royal Palms Chicago, LLC ("RP Chicago").

29.     The Company served as a co-owner and managing member of the Chicago venture, further extending the reach of the Royal Palms brand.  RP Brooklyn and RP Chicago are collectively referred to herein as the "RP Shuffleboard Clubs."

30.     The Company currently holds a 59.5% membership interest in RP Brooklyn and a 30% membership interest in RP Chicago, entitling it to both equity distributions and a management fee derived from each venue's gross revenue.  No salaries are drawn by either owner, even though Mr. Schnapp operated the venues above for the last several years Ms. Albert was an absentee owner.

4898-4785-8513v.2

31.     The remaining interest in RP Brooklyn and RP Chicago is held by numerous silent investors.

32.     RP Brooklyn, located at 14 Union Street, Brooklyn, NY 11215, opened in 2012 to critical acclaim. The venue attracted a loyal and diverse customer base with its signature offering of shuffleboard leagues, live DJs, tropical cocktails, and an immersive retro aesthetic.

33.     Under Mr. Schnapp's leadership, the RP Brooklyn became a neighborhood institution and was frequently featured in local and national media as a model of innovative hospitality.

34.     In fact, the investors in RP Brooklyn were extremely satisfied, as they quickly recouped their initial investment and earned returns beyond that.

35.     RP Chicago, located at 1750 North Milwaukee Avenue, Chicago, IL 60647, opened six years later and replicated the core DNA of the Brooklyn location while tailoring elements to the tastes of the local market. The Chicago venue marked a significant milestone in the brand's national expansion and introduced the Royal Palms experience to a broader audience.

36.     To ensure consistent oversight and address operational demands in Chicago, Mr. Schnapp and Ms. Albert jointly leased a three-bedroom apartment located at 1721 N. Hoyne Ave, Chicago, IL 60647—just two blocks from RP Chicago.

37.     The apartment was used exclusively for business purposes, including supervisory visits, staff training, and venue management. Through March 2025, all rent and utilities were paid by the Company as legitimate and documented business expenses. In fact, during COVID Ms. Albert requested that the apartment's security deposit be used to cover a month's rent to avoid using Company funds.

4898-4785-8513v.2

38.     In March 2025, after Ms. Albert had improperly taken control of the Company, she refused to allow the Company to continue paying the lease. As a result, Mr. Schnapp was forced to cover the remaining two months of rent, at $4,400 per month, from his personal funds.

39.     Both Mr. Schnapp and Ms. Albert maintained dedicated bedrooms in the apartment and used it solely in connection with their responsibilities as managing members. Their stays were coordinated around business needs, and the shared use of the apartment enabled hands-on management of RP Chicago without incurring hotel costs.

**Mr. Schnapp Introduces Ms. Albert To A**
**Strategic Real Estate Venture Through Silent Captain**

40.     In late 2022, Mr. Schnapp learned that the landlord of the RP Chicago premises was considering a sale of the building. Recognizing both the strategic and financial opportunity, Mr. Schnapp conceived the idea of purchasing the property that housed RP Chicago.

41.     Despite having no obligation to do so, Mr. Schnapp invited Ms. Albert to join him in this new venture. Ms. Albert agreed and expressed enthusiasm for the project. As a result, on or about September 23, 2022, Mr. Schnapp and Ms. Albert formed Silent Captain, LLC ("Silent Captain"), a Delaware limited liability company, for the express purpose of acquiring and managing commercial property, beginning with the Chicago venue.

42.     Silent Captain was specifically created to acquire, hold, manage, and potentially transfer real estate assets. The parties executed a separate operating agreement outlining their ownership and managerial rights in the real estate venture.

43.     In connection with the acquisition, Silent Captain secured financing through a loan from the U.S. Small Business Administration (SBA). This financing was used to purchase the commercial property located at 1750–1760 North Milwaukee Avenue, Chicago, IL 60622—the premises in which RP Chicago operates.

44.     The Parties structured matters so that RP Chicago would pay market rent to Silent Captain, and such lease payments would be used to service the SBA loan. This arrangement provided long-term financial stability, ensured operational continuity, and enabled the parties to benefit from both the appreciation of real estate.

**The Operating Agreement And**
**Governance Of Biscuits & Tangs, LLC**

45.     When the Company was formed in 2012, Mr. Schnapp and Ms. Albert were longtime friends with a shared entrepreneurial spirit. In the early years of their business relationship, the parties operated informally, relying on mutual trust, ongoing communication, and a shared vision for building the Royal Palms Shuffleboard brand.

46.     For several years, the parties managed the business without a formal operating agreement, confident in their ability to cooperate and collaborate effectively. During this period, Mr. Schnapp took the lead in day-to-day operations, venue development, and personnel oversight, while Ms. Albert focused on creative contributions and brand storytelling.

47.     As the business grew in complexity and expanded into new markets, Ms. Albert insisted on codifying the parties' respective rights, obligations, and decision-making authority. Mr. Schnapp agreed, and on or about October 22, 2018, the parties entered into a formal Operating Agreement governing the management and ownership of Biscuits & Tangs, LLC.

48.     The 2018 Operating Agreement remains in full force and effect. It has never been amended and continues to govern the parties' respective rights and obligations with respect to the Company.

4898-4785-8513v.2

**Roles and Ownership Structure**

49. Under the Operating Agreement, both Mr. Schnapp and Ms. Albert are designated as Members, Managers, and Managing Members of the Company, each holding a 50% ownership interest. *See* Operating Agreement, Schedule A.

50. Section 3.1 of the Operating Agreement provides that "[t]he Company was formed to manage certain business interests and interests in the Royal Palms Shuffleboard Clubs."

51. It continues, at Section 3.2 expands on that mandate, stating that the business of the Company "shall be to manage the operations of the Royal Palms Shuffleboard Clubs, and to engage in any and all activities necessary, convenient, desirable or incidental to the foregoing."

**Managerial Responsibilities and Compensation**

52. Section 6.1 of the Operating Agreement sets forth the parties' general management responsibilities. It requires each party to "devote such time and effort to the Company as may be reasonable and necessary to carry out its responsibilities," underscoring that both Parties were expected to contribute actively and meaningfully to the business.

53. The Company is not merely a holding entity; it actively manages the Clubs and is entitled to a management fee for doing so. Section 1.1 defines the "Management Fee" as the compensation paid to the Company for its managerial services under the RP Brooklyn and RP Chicago Operating Agreements.

54. Pursuant to those agreements, both RP Brooklyn and RP Chicago are contractually obligated to pay the Company a management fee equal to three to five percent of each RP Shuffleboard Club's gross revenues for management services. *See* Operating Agreement § 1.1; *see also* RP Brooklyn Operating Agreement § 4.06(b); RP Chicago Operating Agreement § 4.06(b).

55. These management fees are a critical component of the Company's income and form part of the economic benefit to which the managers are entitled, in addition to their

proportional share of equity distributions. Indeed, since no salaries are drawn by the Parties, the management fees are an exclusive source of Mr. Schnapp's compensation.

**Major Decision Requirements and Deadlock Resolution**

56. While both parties are empowered to participate in the management of the Company, the Operating Agreement recognizes the potential for deadlock and contains safeguards to ensure collaborative governance.

57. Section 6.2 of the Operating Agreement—entitled "Major Decisions"—establishes that certain significant actions may not be undertaken without the prior written consent of both Managers. These include, but are not limited to:

- Admitting new members to the Company or its subsidiaries;
- Making any purchase in excess of $5,000;
- Entering into any contract exceeding $5,000;
- Hiring or terminating employees or determining compensation;
- Resolving disputes with investors;
- Making changes to the Clubs' brand, logo, or décor;
- Transferring, pledging, or selling membership interests (except as permitted under Article IX).

58. Section 6.2(a) also mandates that no amendment to the Operating Agreement may be made without the prior written consent of both Managers, reinforcing the requirement for bilateral decision-making.

59. To resolve management impasses, Section 6.5 of the Operating Agreement includes a detailed and binding Buy/Sell mechanism. This provision was intended and designed to provide a clean and orderly exit process in the event of an irreconcilable dispute in order to preserve the Company and, by extension, the RP Shuffleboard Clubs.

4898-4785-8513v.2

60.     Under Section 6.5(a)–(b), if a Manager believes in good faith that the parties have reached an impasse, that Manager (the "Offeror") may deliver a written offer to either sell his/her interest to the other Manager (the "Offeree") or to purchase the Offeree's interest at a specified price.

61.     Upon receipt of the offer, the Offeree has thirty (30) days to elect whether to buy or sell. If the Offeree elects to buy, they must simultaneously deliver a non-refundable deposit equal to ten percent (10%) of the offered price. Operating Agreement § 6.5(c).

62.     If the Offeree fails to respond within the thirty-day window, they are deemed to have elected to sell on the terms set forth in the Offeror's notice.

63.     Section 6.5 (b) expressly confirms that the sale price is intended to equate to what would be received in a liquidation scenario where all assets sold and all debts and liabilities returned.  Stated another way, under this Operating Agreement, Ms. Albert's position that Mr. Schnapp should be saddled with a two million dollar contingent liabilities is flatly erroneous.

64.     To avoid disputes over valuation, Section 6.5(c) allows the parties to engage an accountant to resolve disagreements over purchase price calculations. The Operating Agreement further provides that the Company's accountant shall be deemed the mutually agreed-upon accountant. *See* Operating Agreement 6.5(c). (This is the same accountant who made and developed the 2024 fourth quarter distribution which is referred to above)

**Restrictions on Transfer and Estate Planning Exception**

65.     The Company was a personal endeavor to Ms. Albert and Mr. Schnapp, and the Operating Agreement provided that each individual had an interest in ensuring that there would be no changes to the management of the Company or the ownership of Company without the consent of both individuals as Members.

66.     Specifically, Article IX generally provides that no Member may transfer their interest without the other Member's written consent, and that any attempted transfer in violation of this restriction "shall be void *ab initio* and shall not bind the Company."

67.     The Operating Agreement simultaneously recognizes that a Member may be able to realize certain personal tax or estate planning benefits by holding his or her interest in the Company in an Affiliate entity he or she controls. Such an estate planning transactions would not impact the general intent of Ms. Albert and Mr. Schnapp to keep ultimate management responsibility for the Company between them.

68.     Section 9.1(b) thus provides that a "Member may, without the written consent of the other Member, transfer its Interest in the [the Company] to an immediate family member, one or more trusts for estate planning purposes."

69.     This exception makes clear that, so long as the overall intent of Ms. Albert and Mr. Schnapp preserve their mutual intent for the ultimate control of the Company to remain between them, each Member has the right to establish an individually sensible estate planning vehicle to hold his or her interest.

**Ms. Albert's Longstanding Abdication Of**
**Managerial Duties And Relocation To California**

70.     Although Ms. Albert was designated as an equal partner and Managing Member of the Company, her actual involvement in its management was minimal and steadily declined over time. From the outset, Ms. Albert treated her title as largely symbolic, relying on Mr. Schnapp to manage the Company's day-to-day affairs.

71.     Between 2012 and 2017, Ms. Albert remained primarily focused on her career as a voice actress, allegedly contributing to major productions such as *Ice Age: Continental Drift*, *Epic*,

*Tennessee Tuxedo and Chumley*, *Minecraft: Story Mode*, *Minecraft: Story Mode – Season 2*, and *Happy!*

72.     In or around 2015, Ms. Albert launched a separate business venture—The Matzo Project—a snack food company that she publicly promoted and positioned as her primary entrepreneurial focus.

73.     By 2017, Ms. Albert was publicly celebrating The Matzo Project's success in national media, clearly shifting her professional energy away from the Company and toward her personal venture.

74.     Over time, Ms. Albert's disengagement from Company operations became more pronounced. Starting in 2020, and fully by 2021, she had effectively abdicated her responsibilities as a Managing Member to focus exclusively on The Matzo Project, leaving Mr. Schnapp to manage both RP Brooklyn and RP Chicago.

75.     Ms. Albert's own social media confirmed this shift. On December 17, 2020, she promoted The Matzo Project's efforts to expand year-round sales, posting about a pitch to a grocery buyer during Passover.

76.     She continued with frequent promotional posts throughout 2021 and 2022: on January 26, 2021 (seeking Photoshop help for marketing); February 26, 2021 (announcing new Matzo Bites); April 19, 2021 (discussing the end of The WunderCluster season); and May 14, 2021 (celebrating placement of Matzo Bites on JetBlue flights).

77.     On January 5, 2022, Ms. Albert posted about advertising campaigns and brand partnerships for The Matzo Project, including collaborations with Whole Foods.

78.     Her promotional activities continued throughout 2022. She posted on April 11, 2022 (event with Social Brooklyn); June 11, 2022 (food show at the Javits Center); September 9,

2022; and December 9, 2022 (chocolate collaboration with Fine and Raw Chocolate). In January 2023, she posted repeatedly about her participation in a Las Vegas food expo.

79. On March 28, 2023, Ms. Albert appeared on the *Essential Ingredients* podcast, identifying herself as the founder of The Matzo Project and emphasizing her leadership in marketing and business growth.

80. In early 2023, the Brooklyn Club faced a public relations challenge after reports surfaced regarding indoor air quality concerns linked to pollution near the Gowanus Canal. Mr. Schnapp worked tirelessly to address the issue, cooperating closely with the New York State Department of Environmental Conservation (DEC) and Department of Health (DOH). Those agencies later issued a public clarifications that RP Brooklyn was fully vetted and found to be in compliance with air quality standards.

81. Rather than assisting in managing the fallout or helping to calm customer concerns, Ms. Albert exacerbated the situation. She posted inflammatory messages on social media, including:

> If you've been following along, you may've seen the super-irresponsible (and erroneous!) @Gothamist article from last week that tossed us into the bitter battle between the developers of Gowanus (aka our landlords) and the people trying to thwart them… The article falsely stated in no uncertain terms that we've had toxic, carcinogenic fumes wafting into our space for years and were deliberately hiding this fact… in the name of selling a few more Piña coladas.

82. Shortly after this incident, Ms. Albert permanently relocated to California. Despite no longer residing in New York or participating in Company operations, she continued to demand fifty percent (50%) of the management fees—fees intended to compensate for actual managerial services.

32

83.     From the outset, Ms. Albert contributed far less than Mr. Schnapp to the Company's growth and daily operations. While Mr. Schnapp worked full-time—often logging 80-hour weeks—managing staff, finances, vendor relationships, marketing, and customer experience, Ms. Albert focused primarily on her unrelated pursuits.

84.     Ms. Albert frequently claimed that her part-time creative contributions equaled Mr. Schnapp's full-time managerial work. In practice, however, she avoided financial responsibilities, struggled with employee management, and repeatedly declined to engage in essential operational tasks.

85.     Mr. Schnapp was therefore left to shoulder nearly all management duties. He oversaw venue maintenance, coordinated staffing, handled tax and legal matters, and ensured customer satisfaction—critical tasks that sustained the Clubs' popularity and reputation.

86.     On the rare occasion when Ms. Albert did participate, her contributions were often counterproductive. She frequently proposed whimsical, impractical ideas—such as remote control fish races or secret-password promotions.

87.     During the COVID-19 pandemic, when the Clubs were temporarily shut down, Mr. Schnapp led a successful pivot to virtual programming and maintained employee morale. Ms. Albert, by contrast, suggested bizarre and unworkable safety protocols, such as installing plastic shower curtains between courts or requiring inflatable inner tubes for distancing. Moreover, she would frequently work against Mr. Schnapp's plan to reopen the Clubs.

88.     Recognizing the need for competent leadership, Mr. Schnapp asked Ms. Albert to step aside from day-to-day Management decision making, but still assist with the clubs. However, she refused to re-engage and ultimately withdrew completely.

4898-4785-8513v.2

89.     Ms. Albert's erratic communication and mismanagement of staff further destabilized the workplace. Her behavior led to several resignations and eroded trust within the organization. In March 2023, she informed Mr. Schnapp that she had permanently relocated to California and would no longer participate in the management of the business.

**Ms. Albert's Refusal To Share Operational Burdens**
**Or Renegotiate The Management Fee Forces Deadlock**

90.     By the spring of 2022, Mr. Schnapp was working approximately 80 hours per week managing every aspect of the RP Shuffleboard Clubs. His tireless efforts ensured the continued success and smooth operation of both RP Brooklyn and RP Chicago.

91.     In stark contrast, Ms. Albert's participation had dwindled to sporadic, non-substantive appearances at the Brooklyn venue—often limited to photo opportunities or promotional efforts for her unrelated ventures. She had effectively abdicated her managerial duties while still holding herself out as an equal partner.

92.     Despite her near-total withdrawal, Ms. Albert continued to demand fifty percent (50%) of the Management Fees paid to the Company—fees contractually intended to compensate for active, ongoing operational involvement. This demand was plainly unjustified given her lack of contribution.

93.     In or around December 2022, Mr. Schnapp confronted this inequity and candidly informed Ms. Albert that the existing arrangement was unsustainable. He explained that he could no longer shoulder the overwhelming burden of operational responsibilities while receiving only half of the fees specifically designed to reward such contributions.

94.     In response, Ms. Albert argued that Mr. Schnapp should draw a salary directly from the Clubs, rather than receive a larger share of the Management Fee being paid to the Company. Mr. Schnapp explained that doing so would be unfair to the investors and could constitute improper

34

double dipping, since the Company was already being compensated for management services. The Company's CFO agreed with Mr. Schnapp's assessment.

95.     In an effort to resolve the imbalance fairly and amicably, Mr. Schnapp proposed amending the Operating Agreement to reallocate 100% of the Management Fee to himself. His proposal also expressly preserved Ms. Albert's full pro rata share of ownership distributions, thereby safeguarding her economic interest.

96.     Rather than engage in constructive dialogue, Ms. Albert responded with hostility and threats. She warned that if her demands were not met, she would contact media outlets and fabricate a negative story to damage the Company's reputation. These threats were wholly inappropriate and demonstrated a disregard for the Company's goodwill and stability.

97.     During these discussions, Ms. Albert expressed a willingness to exit the business but conditioned her departure on receiving $5 million for her interest in the Company. This figure was grossly inflated and unsupported by any financial data, independent appraisal, or credible market analysis.

98.     To test the legitimacy of her valuation, Mr. Schnapp encouraged Ms. Albert to explore third-party buyers. He did so in good faith, facilitating access and allowing ample time for her to pursue potential transactions.

99.     Despite these efforts, Ms. Albert failed to attract any credible offers approaching her $5 million demand. The market response confirmed what Mr. Schnapp had already concluded: Ms. Albert's valuation bore no relation to the Company's actual worth.

100.    Ultimately, Mr. Schnapp's efforts to resolve their differences were unsuccessful. Left with no alternative and facing a continuing operational imbalance, on November 18, 2024, Mr. Schnapp formally invoked his rights under Section 6.2 of the Operating Agreement and

4898-4785-8513v.2

proposed an amendment reallocating 100% of the Management Fee to himself. His proposal preserved Ms. Albert's right to her full share of equity distributions, ensuring she would continue to benefit economically despite her lack of participation.

101.    Ms. Albert refused to consent to the proposed amendment, thereby creating a deadlock on a Major Decision under Section 6.2. Her refusal to acknowledge the plainly inequitable status quo or offer a viable counterproposal left the Company in a state of paralysis.

102.    As a result, Mr. Schnapp was left with no choice but to invoke the Buy/Sell provision under Section 6.5 of the Operating Agreement to resolve the deadlock and protect the continued viability of the business.

**Ms. Albert's Failure To Accept A Valid**
**Buy/Sell Offer Is Deemed An Election To Sell**

103.    On December 14, 2024, faced with an unresolved managerial deadlock and no viable path to a consensual resolution, Mr. Schnapp invoked the Buy/Sell provision set forth in Section 6.5 of the Operating Agreement. Exercising his contractual rights, he delivered a written notice to Ms. Albert, offering either (i) to purchase her interest in the Company for $1.4 million or (ii) to sell his interest to her for the same price.

104.    Section 6.5 of the Operating Agreement provides a self-executing mechanism designed to resolve precisely such impasses between the Managing Members. It sets forth a clear and binding process:

- A Managing Member who believes in good faith that an irreconcilable impasse exists may issue an irrevocable written offer to the other party (the "Offeree") to either purchase the Offeree's entire interest or sell their own interest at a stated price;

- The offer must include a valuation of Company assets and a good faith calculation of the amount the selling Member would receive if all Company assets were liquidated, and distributions made in accordance with Section 10.3;

36

- The Offeree then has thirty (30) days to respond by electing either to buy or sell. If electing to buy, the Offeree must concurrently provide immediately available funds equal to ten percent (10%) of the purchase price as a non-refundable deposit;

- If the Offeree fails to respond within thirty days, or fails to timely deliver the deposit, they are automatically deemed to have elected to sell their interest;

- In the event of a failure to close by the defaulting party, the non-defaulting party may seek specific performance and/or actual damages.

105. Rather than accept the offer in accordance with these terms, on January 11, 2025—twenty-eight days later—Ms. Albert submitted a purported "counteroffer" in the form of a proposed Acquisition Agreement. Her response failed to satisfy the express requirements of Section 6.5 in multiple material respects.

106. Ms. Albert's proposal included numerous additional provisions not authorized by the Operating Agreement, including:

- Broad due diligence and financing contingencies allowing her to cancel the deal "in her sole and absolute discretion";

- An escrow structure under which the deposit would be held solely by Ms. Albert's counsel, subject only to her instruction for its release; and

- A provision stating that Ms. Albert would retain the deposit even if she terminated the transaction for any reason.

107. Among other deviations, Ms. Albert's proposed agreement stated that she could terminate the transaction:

- "if Buyer, in its sole and absolute discretion, is not satisfied with the results of its due diligence investigation"; and

- "if Buyer is unable to obtain third-party financing... on terms and conditions satisfactory to Buyer in its sole discretion."

108. Critically, the required 10% deposit—equal to $140,000—was not delivered to Mr. Schnapp. Instead, Ms. Albert's counsel allegedly placed the funds in an escrow account under her

sole control, effectively rendering the deposit refundable and conditional, in direct violation of Section 6.5.

109.    On January 24, 2025, during a Zoom conference between the parties' counsel, Mr. Schnapp sought confirmation that the proposed deal was not contingent upon due diligence or financing and that the $140,000 deposit was non-refundable. No confirmation was provided.

110.    Ms. Albert failed to comply with the express procedural and financial requirements of Section 6.5(c). She neither delivered a compliant acceptance nor provided the required non-refundable deposit within the thirty-day period. As such, Ms. Albert is deemed, by operation of the Operating Agreement, to have elected to sell her interest in the Company to Mr. Schnapp.

111.    As described below, in addition to now being contractually obligated to sell, Ms. Albert then went on a course of conduct that materially breached the Operating Agreement, obstructed corporate governance, and forced Mr. Schnapp to pursue judicial enforcement of his contractual rights, including specific performance and damages as permitted by Section 6.5(e).

**Mr. Schnapp's Continued Good Faith**
**Efforts And Ms. Albert's Obstruction**

112.    Despite having a clear contractual right to compel a sale of the Company under Section 6.5 of the Operating Agreement, Mr. Schnapp chose not to pursue litigation. Instead, he exercised restraint and professionalism, prioritizing the health of the business and the parties' longstanding personal and professional relationship. He made a concerted effort to settle the parties' disputes amicably and avoid the disruption, cost, and reputational harm of a protracted legal battle.  He made clear, however, that it was being done under a complete reservation of rights. By way of example:

- On January 28, 2025, counsel for Mr. Schnapp wrote that "this email is sent without prejudice and under a complete reservation of rights."

- On February 6, 2025, counsel reiterated that "[t]his letter is sent with full reservation of rights."

- On February 18, 2025, Mr. Schnapp stated: "Mr. Schnapp maintains his position that Ms. Albert did not properly accept the offer to buy/sell. However, to avoid further disputes and without waiving any rights, he is prepared to move forward with the sale subject to the parties entering into a mutually agreed-upon purchase agreement."

- On February 25, 2025, counsel confirmed that "Mr. Schnapp is ready to proceed with the sale, subject to both parties entering into a mutually agreed-upon purchase agreement … [and that] Mr. Schnapp reserves all rights."

- On February 27, 2025, March 3, 2025, and March 7, 2025, further correspondence reiterated that "Mr. Schnapp reserves all rights and does not waive any position that was taken previously."

113.    Thus, Mr. Schnapp continued to engage in good faith negotiations. He remained focused on finding a practical and equitable resolution that would allow both parties to move forward without unnecessary litigation.

114.    Throughout this period, Mr. Schnapp made every effort to preserve the business's operations and goodwill, minimize internal disruption, and protect the Company's employees and reputation. He consistently acted with integrity and transparency, seeking a clean, final resolution that would fairly reflect the parties' respective contributions to the business.

115.    However, rather than meet these efforts in kind, Ms. Albert escalated her obstructionist behavior. She acted in bad faith and attempted to wrest control of the Company without honoring her contractual obligations, includes her duty to relieve Mr. Schnapp of Company-related debts and liabilities as part of any transfer of ownership.

116.    Ms. Albert's efforts to undermine and sideline Mr. Schnapp were not limited to a single instance. Instead, they followed a troubling and deliberate pattern, which included:

- Failing to replace Mr. Schnapp as the sole personal guarantor of the RP Brooklyn lease, despite the fact that she would become the sole owner of the Company under the buyout transaction;

- Refusing to release Mr. Schnapp from the RP Chicago lease guarantee, even though she would have controlled both the tenant entity (RP Chicago) and the landlord entity (Silent Captain), and thus had full authority to effectuate the release;

- Attempting to remove Mr. Schnapp as a Manager of the Company on the fabricated basis that he had transferred and rescinded his economic interest to a trust for estate planning purposes—a transfer expressly permitted under the Operating Agreement;

- Locking Mr. Schnapp out of Company email accounts, records, and administrative platforms, thereby impairing his ability to fulfill his managerial duties and protect his interests;

- Manufacturing a baseless claim concerning a routine quarterly distribution—an action long treated as standard practice and within the bounds of the Operating Agreement;

- Unilaterally making Major Decisions on behalf of the Company without the required consent of Mr. Schnapp, in direct violation of Section 6.2 of the Operating Agreement.

117. These actions were not isolated missteps. Rather, they formed a broader pattern of bad-faith behavior designed to force Mr. Schnapp out of the business without honoring her contractual obligations. Her conduct ultimately made it impossible to complete the transaction or maintain joint governance, leaving Mr. Schnapp with no choice but to seek judicial intervention.

**Ms. Albert's Failure to Facilitate the Release
of Mr. Schnapp from the Company Guaranty**

118. As part of the Buy/Sell process triggered under Section 6.5 of the Operating Agreement, Ms. Albert had the obligation to ensure that Mr. Schnapp was released from all Company-related debts and liabilities, including personal guarantees associated with the Company's commercial leases.

4898-4785-8513v.2

119.    Section 6.5(a) of the Operating Agreement expressly stated that the purchaser must purchase the other person's total interest in the Company.

120.    Section 6.5(b) of the Operating Agreement expressly states that the purchase price represents the amount due under a hypothetical payment of "all debts of the Company."

121.    These provision include personal guarantees that Mr. Schnapp undertook for the benefit of Company operations.

122.    At the time the Buy/Sell mechanism was triggered, only Mr. Schnapp signed the personal guaranty of the RP Brooklyn lease—a substantial and long-term commercial lease agreement.

123.    Mr. Schnapp had provided this guarantee in his role as co-founder and managing member of the venue, and his creditworthiness was critical to securing the lease in the first place.

124.    As of today, RP Brooklyn still had approximately six million remaining on the lease.

**Ms. Albert's Refusal to Acknowledge or Act on Her Obligation**

125.    However, Ms. Albert initially refused to acknowledge her obligation to replace Mr. Schnapp as guarantor. In a letter dated February 4, 2025, her counsel claimed—contrary to the express language and commercial realities of the Operating Agreement—that there was "nothing in the Operating Agreement or the terms of the sale that would entitle [Mr. Schnapp] to be removed from personal guarantees." Her counsel went so far as to threaten litigation if Mr. Schnapp refused to proceed to closing.

126.    This position was meritless and contradicted the Operating Agreement.  Plus it made no commercial sense. Mr. Schnapp's personal guarantee was part of the interest that Ms. Albert agreed to purchase. Plus, it qualified as a Company-related "debt" that needed to be extinguished as part of the transaction.

41

127.     Plainly, it would be commercially unreasonable—and unconscionable—to require a selling member to remain liable for personal guarantees while relinquishing all ownership and control over the Company. These protections are standard and necessary provisions in any arm's-length exit transaction.

128.     On February 6, 2025, Mr. Schnapp's counsel responded, reiterating the need for a comprehensive management plan and resolution of personal guarantees. Ms. Albert, who had relocated to California and no longer participated in day-to-day operations, failed to provide any concrete plan to satisfy these obligations. It was wholly unreasonable to expect that Mr. Schnapp would remain liable as guarantor while being shut out of the Company and left uninformed as to its future operations.

129.     On February 9, 2025, Ms. Albert again refused to move forward with the release. Instead, she proposed that Mr. Schnapp accept a "drastic reduction in the amount paid to him at Closing" in exchange for a release from his lease obligations—despite the fact that such a release was already contractually required and should not have required additional concessions.

130.     Despite these refusals, Ms. Albert continued to falsely assert that closing was imminent. On February 18, 2025, her counsel wrote: "Please note that we anticipate setting the Closing date shortly and will expect Mr. Schnapp to be prepared to close on that date, as required." This was misleading, as she had yet to fulfill the fundamental condition of securing his release.

131.     Not until February 28, 2025—nearly three months after the Buy/Sell trigger—did Ms. Albert's counsel finally acknowledge the issue, stating that they were open to releasing Mr. Schnapp and requesting the landlord's contact information. However, this outreach was perfunctory, lacked any detail, and made clear they had not yet engaged with the landlord.

4898-4785-8513v.2

132.     On March 5, 2025, Ms. Albert's counsel represented that the landlord had agreed in principle to release Mr. Schnapp.

133.     In reliance on that representation, that the release had been secured for all intents and purposes secured, Mr. Schnapp's counsel circulated a revised draft of the Membership Interest Purchase Agreement (MIPA).

134.     But, it turned out Plaintiff's representation about the release was greatly exaggerated. On or about March 11, 2025, Mr. Schnapp learned that the landlord had not received necessary documentation or financial assurances from Ms. Albert's team and had not heard from her in weeks.

135.     In fact, the landlord raised serious doubts about Ms. Albert's financial viability and managerial experience. They expressed concern that she had no meaningful history of operational involvement in the Brooklyn venue and could not credibly step in as sole guarantor.

136.     Because the landlord refused to release Mr. Schnapp without a satisfactory replacement guarantor, the transaction could not close.

137.     Ms. Albert's conduct, and further information and belief, demonstrated that Ms. Albert never intended to secure such a release. Instead, she intended to close the deal while leaving Mr. Schnapp saddled with personal obligations over which he had no control—a tactic that was both commercially unreasonable and legally indefensible.

138.     Because Ms. Albert failed to satisfy the landlord's conditions or demonstrate a good faith intent to secure such release promptly following the closing, a March 12, 2025 closing was not possible. Her failure was a direct breach of Section 6.5(b) of the Operating Agreement and a further demonstration of bad faith.

4898-4785-8513v.2

139. Ms. Albert thereafter delayed action for weeks. Only on April 23, 2025—more than four months after the Buy/Sell trigger—the landlord circulated a draft guaranty release. That release named Ms. Albert and a third party, Laura Tanny Huang, as replacement guarantors. Notably, Ms. Huang is the spouse of a party to whom, upon information and belief, Ms. Albert had pledged an interest in the Company to, creating additional complications and questions about governance.

140. Ms. Albert then failed to provide updates. On May 12, 2025, after receiving no communication, Mr. Schnapp's counsel again requested a status update. Ms. Albert's counsel claimed there were unresolved "Company objections" to the draft release, though none had been previously raised and no details were provided.

141. On May 20, 2025, Ms. Albert's counsel received the amendment to the lease, which would release Mr. Schnapp as a guarantor. Ms. Albert's counsel did not forward the release to Mr. Schnapp until the afternoon of Friday, May 23, 2025—just before Memorial Day weekend. It was not seen by Mr. Schnapp or his counsel until the following week.

142. The final lease amendment included a new and previously undisclosed "drop-dead" clause requiring that the closing take place no later than May 31, 2025. Upon information and belief, this provision was inserted unilaterally by Ms. Albert or her counsel without any prior notice to Mr. Schnapp.

143. This last-minute clause was clearly intended to create artificial urgency and pressure Mr. Schnapp into a rushed and unfavorable closing. It was the culmination of Ms. Albert's continued delay tactics and further evidence of her bad faith.

144. And, it raises questions as to whether the fabricated drop dead date was designed to distract attention from a critical clause snuck into the release, as described below.

4898-4785-8513v.2

145.     In addition to the Brooklyn lease, Mr. Schnapp was also a personal guarantor on obligations connected to the Chicago property—1750–1760 North Milwaukee Avenue—owned by Silent Captain, the real estate holding company co-founded by Mr. Schnapp and Ms. Albert that leases the premises to RP Chicago.

146.     Silent Captain was jointly controlled by the same parties involved in the Buy/Sell transaction. As such, releasing Mr. Schnapp from his personal guaranty obligations should have been a straightforward, proforma matter—one that required nothing more than mutual agreement between Ms. Albert and Mr. Schnapp.

147.     Yet, despite the simplicity of the task, Ms. Albert ignored Mr. Schnapp's repeated requests to facilitate the release. For over two months after the Buy/Sell trigger, she failed to even acknowledge the issue, allowing unnecessary delay to accumulate while exposing Mr. Schnapp to ongoing financial liability—despite her full ability to resolve the matter with a signature.

148.     When her counsel finally responded on February 28, 2025, they admitted: "Silent Captain is the landlord, so he and Ashley together will be able to release him."

149.     However, just before this lawsuit was filed, Ms. Albert's counsel circulated a draft release document that included a new, improper condition: that Mr. Schnapp resign as Manager of Silent Captain. This demand was completely unrelated to the Buy/Sell transaction and had never been discussed or negotiated.  Suspiciously, it was inserted unilaterally and without justification. As if that were not enough, given the Parties' history, described above, it would be preposterous to suggest Mr. Schnapp should give up control of a separate company he half owns.

150.     Silent Captain was not a party to the Buy/Sell process. There was no legal or contractual basis for conditioning a lease guaranty release on Mr. Schnapp's resignation from a

separate business entity. Mr. Schnapp had never agreed to relinquish his governance rights in Silent Captain and had no obligation to do so.

151.    When Mr. Schnapp's counsel objected to the inclusion of the resignation clause, Ms. Albert's refused to proceed unless it remained.

152.    This was not a legitimate negotiation tactic. It was a coercive action of power designed to extract leverage in one business relationship by holding hostage a necessary release in another. Ms. Albert's conduct was calculated, obstructive, and emblematic of the bad-faith strategy she had adopted throughout the Buy/Sell process.

153.    Her refusal to decouple the Silent Captain resignation clause from the lease release, violated not only the Operating Agreement but also the covenant of good faith and fair dealing implied in all contracts.

**Ms. Albert's Pre-Closing Threats of Post-Closing Litigation**

154.    From the moment the Buy/Sell provision was triggered under Section 6.5 of the Operating Agreement, tensions escalated between the parties, with each accusing the other of breaching their contractual obligations. Among other things, Ms. Albert sought to manufacture a claim that the Clubs' routine fourth-quarter distributions in early 2025 violated the Operating Agreement.

155.    But, the Operating Agreement expressly permits ordinary course distributions. These distributions were entirely routine and consistent with the Companies' historical practices. They were developed and made by the Company's Chief Financial Officer—an individual who had been designated to resolve disputes related to the Buy/Sell purchase price.

156.    Furthermore, since under the Operating Agreement, the CFO is responsible to determine disagreements concerning the purchase price, if the CFO had believed the distributions were improper or related to the Buy/Sell process, he would have intervened.

157. Nevertheless, Ms. Albert responded with threats of litigation. In addition to direct threats, Ms. Albert told Mr. Schnapp's mother that she planned to sue Mr. Schnapp after the transaction closed. This threat revealed her bad faith: rather than using the Buy/Sell process to resolve their disputes, she intended to complete the transaction and then weaponize litigation based on previously known issues.

**Ms. Albert's Improper Attempt to**
**Remove Mr. Schnapp as Manager**

158. On March 13, 2025, Mr. Schnapp's counsel received a letter via email from Ms. Albert's counsel purporting to remove Mr. Schnapp from his role as Manager of the Company.

159. The letter stated that:

> "Pursuant to Section 6.11 of the Operating Agreement and Ms. Albert's authority as a Manager, Member, and Managing Member, Ms. Albert hereby removes Mr. Schnapp from his position as a Manager of the Company, effective immediately. She has today executed a consent to that effect. Mr. Schnapp's removal is for Cause, on the basis of his ceasing to be a Member of the Company as of February 18, 2025. See Operating Agreement § 6.11 ('Cause' means . . . (iii) a Manager ceasing to be a Member.'). Effective immediately, Mr. Schnapp no longer has any authority as a Member or Manager, and any further acts he purportedly takes with respect to the Company are unauthorized, ultra vires actions taken in his personal capacity. Any further attempts by Mr. Schnapp to represent or act on behalf of the Company or in a capacity as a Manager or Member shall be considered fraudulent."

160. Upon information and belief, on March 13, 2025 Ms. Albert signed a Member Consent of Biscuit and Tangs, where she purported to remove Mr. Schnapp as Manager of the Company. However, Mr. Schnapp never received this Member Consent, which violated the notice requirements of the Operating Agreement.

161. Moreover, this attempt to remove Mr. Schnapp was entirely improper and based on a misreading of the Operating Agreement. Section 9.1(b) of the Operating Agreement expressly provides that "a Member may, without the written consent of the other Member, transfer its Interest

47

in the LLC to an immediate family member, one or more trusts for estate planning purposes, or an Affiliate, provided such Member controls such Affiliate."

162.     Section 6.11 of the Operating Agreement, permits removal "for Cause" if a "Manager ceases to be a Member."

163.     The Operating Agreement defines "Interest" to mean "a Member's limited liability company interest in the Company which represents such Member's share of the profits and losses of the Company and a Member's right to receive distributions of the Company's assets in accordance with the provisions of this Agreement"—*i.e.*, the economic interest only.

164.     It is well-established under New York LLC law that economic interests and governance rights are distinct and severable. The transfer of an economic interest under Section 9.1(b) does not affect a Member's status or managerial authority. Ms. Albert's assertion that Mr. Schnapp ceased to be a Member based on an estate-planning transfer that did not alter his control or involvement is inconsistent with both the text and intent of the Operating Agreement.

165.     The nature of the Buy/Sell negotiations confirms this distinction. Ms. Albert's own proposed transaction documents required not only the sale of Mr. Schnapp's economic interest, but also a separate, formal resignation as Manager. If the transfer of economic rights alone were sufficient to divest him of governance status, such a resignation would have been redundant. That it was expressly required reflects the parties' shared understanding that a sale of economic interest does not equate to removal from governance.

166.     In any event, even if Ms. Albert had a good-faith basis to contest the transfer, the remedy would be limited. Section 9.1(e) of the Operating Agreement provides that any non-compliant transfer is merely "null and void." It does not result in forfeiture of membership or

justify removal. There is no provision authorizing unilateral removal of a Manager based on a permissible, or even disputed, estate-planning transfer.

167. Moreover, shortly after the initial transfer was made, Mr. Schnapp rescinded the agreement on the advice of his estate counsel, not in response to Ms. Albert's improper removal effort.

168. Ms. Albert's attempt to exploit an estate-planning maneuver to justify a unilateral removal was a pretext and part of a broader effort to wrest control of the Company. It further demonstrates her bad faith and disregard for the Operating Agreement and applicable law.

**Ms. Albert's Unauthorized Decisions And**
**Resulting Harm To Company Performance**

169. While the Buy/Sell was pending, Ms. Albert began making unilateral Major Decisions in breach of Section 6.2 of the Operating Agreement, which expressly requires joint Manager approval for all such decisions.

170. These unauthorized actions included, but were not limited to, the hiring of a new Director of Operations, Peter Huang, and a Culinary Director, Nik Barricelli—two newly created positions that never previously existed within the Company's structure. These hires materially altered the Company's management and staffing structure, yet Ms. Albert undertook them unilaterally and without any input from Mr. Schnapp.

171. Ms. Albert also initiated significant renovations to the Brooklyn venue, including dismantling the existing food truck bay and converting it into a permanent kitchen. This was a substantial and costly alteration that not only affected the financial condition of the Company but also altered its business model—again without the consent or even consultation of Mr. Schnapp.

172. Further, Ms. Albert began entering into new vendor contracts and commitments on behalf of the Company. Each of these decisions, individually and collectively, constituted a "Major

Decision" under Section 6.2 of the Operating Agreement, and thus required mutual written approval, which Ms. Albert neither sought nor obtained.

173.    Ms. Albert also publicly announced that she intended to make Peter Huang her operating partner, a declaration that demonstrated her intent to assume unilateral control of the Company despite not having completed the Buy/Sell transaction or lawfully acquiring 100% ownership.

174.    In addition to her unauthorized business decisions, Ms. Albert took several coercive and obstructive actions to marginalize Mr. Schnapp and impair his rights as a Manager and Member. These included:

- Locking Mr. Schnapp out of the Company's email accounts, including both RP Brooklyn and RP Chicago addresses;

- Locking Mr. Schnapp out of his own personal email account, which had been used for business communications;

- Blocking his access to Company management meeting minutes and records;

- Cutting off his access to the "7 Shifts" employee scheduling and communication software used for both venues;

- Locking him out of the Company's social media accounts, thereby cutting him off from essential branding, marketing, and communications platforms;

- Preventing him from accessing the "RECREC" shuffleboard league scheduling and communication platform;

- Denying him access to the Company's website maintenance tools on Squarespace, eliminating his ability to oversee or manage customer-facing content.

175.    Ms. Albert's conduct was part of a broader campaign to entrench herself in exclusive control of the Company while deliberately obstructing Mr. Schnapp's managerial rights and frustrating the intended outcome of the Buy/Sell process. Her actions materially impacted the operations, governance, and financial condition of the Company and constituted direct breaches of the Operating Agreement.

176.    Ms. Albert's mismanagement during this period has also caused tangible harm to the Company's financial performance. During the three-month period when Ms. Albert was exercising unilateral control—March, April, and May 2025—the Company experienced significant declines in both revenue and profitability as compared to the same period in 2024:

- Total 2024 sales of $1,532,000 and profits of $205,000
- Total 2025 sales of $1,280,000 and an estimated a loss of $15,000

177.    These declines underscore the direct economic consequences of Ms. Albert's unauthorized and mismanaged decision-making, further supporting Mr. Schnapp's claims for damages.

178.    Plainly, as shown above, Ms. Albert's improper removal of Mr. Schnapp as Manager and her exercise of exclusive control over the Company has already caused, and will continue to cause, irreparable harm to both the Company and Mr. Schnapp.

179.    Accordingly, due to Ms. Albert's inappropriate actions, Ms. Albert has been stripped Mr. Schnapp of his rightful role in the governance of a business he co-founded, built, and actively managed for over a decade. The Operating Agreement expressly limits the authority of either Manager to act unilaterally, and Ms. Albert's conduct directly contravenes that structure. If she is permitted to continue exercising unilateral authority—without legal entitlement or contractual authorization—the Company will be subjected to ongoing, misguided, unchecked decision-making that undermines its operational integrity, financial health, and reputation.

180.    Irreparable harm is particularly evident in Ms. Albert's pattern of decision-making while in sole control. As demonstrated, during just three months of her unilateral management, the Company's financial performance declined precipitously—turning previously profitable operations into losses. This damage cannot be undone with money alone. The reputational harm to the venues, the degradation of customer experience due to poorly vetted strategic changes, and

the potential alienation of key staff and vendors are all forms of injury that are difficult, if not impossible, to quantify or redress through damages. In other words, if these changes continue, the Company risks not only further financial losses but also serious reputational harm and customer alienation.

**Ms. Albert's Refusal To Close The Transaction**

181.     Despite Ms. Albert's sustained bad faith and obstructionist conduct throughout the negotiation process, Mr. Schnapp remained ready, willing, and able to close the transaction in accordance with the terms of the Buy/Sell provision and the parties' negotiated agreements. Of course, he did so under a complete reservation of rights.

182.     On May 30, 2025, Mr. Schnapp delivered to Ms. Albert a fully executed version of the Membership Interest Purchase Agreement. This version incorporated all material terms that had been negotiated between the parties, including provisions concerning mutual releases, disclaimers of known claims, and confirmation that Mr. Schnapp would be released from personal guarantees—most notably, the lease for the Royal Palms Chicago venue.

183.     Importantly, the version of the Chicago lease assignment delivered by Mr. Schnapp did not include any requirement that he resign as a Manager of Silent Captain, LLC—the separate real estate entity that serves as the landlord for the Chicago venue. This was consistent with the parties' negotiations to that point and reflected the complete absence of any legitimate basis to condition the release on Mr. Schnapp's resignation from an unrelated governance role in a separate company.

184.     Rather than execute the final documents and proceed to closing, Ms. Albert refused to sign. Her refusal was not based on any genuine deficiency in the documents or failure to meet negotiated terms. Instead, it was simply a continuation of her broader campaign to delay closing, extract extracontractual concessions, and preserve leverage to pursue post-closing litigation.

185.    Ms. Albert's refusal to execute the agreed-upon documents, despite Mr. Schnapp's full compliance with all closing requirements, constitutes a clear and material breach of the Operating Agreement and underscores her continued unwillingness to complete the transaction in good faith.

## FIRST COUNTERCLAIM

186.    Mr. Schnapp repeats and realleges each and every allegation above as if fully set forth herein.

187.    The Buy/Sell provision of the Operating Agreement is enforceable and mandates the sale of Ms. Albert's interest upon her deemed election to sell.

188.    By responding to the Buy/Sell Offer with a counteroffer, Ms. Albert rejected the Buy/Sell offer.

189.    Additionally, Ms. Albert's response to the counteroffer was past the deadline to accept the offer.

190.    Under the Operating Agreement, if the Offeree rejects the offer, they are required to sell their interest in the Company.

191.    Mr. Schnapp has complied with all contractual prerequisites and ready, willing, and able to consummate the purchase.

192.    Ms. Albert's interest in the Company is unique, and monetary damages alone are inadequate to remedy her refusal to perform.

193.    Mr. Schnapp seeks an order compelling Ms. Albert to execute all documents necessary to effectuate the transfer of her interest in the Company.

4898-4785-8513v.2

194.     Mr. Schnapp is entitled to attorneys' fees under the Operating Agreement pursuant to Section 6.5(c).

## SECOND COUNTERCLAIM

195.     Mr. Schnapp repeats and realleges each and every allegation above as if fully set forth herein.

196.     The Operating Agreement is a valid and binding contract between Mr. Schnapp and Ms. Albert governing their rights and obligations as Members and Managers of the Company.

197.     Section 6.5 of the Operating Agreement sets forth a Buy/Sell process that is self-executing and mandatory upon a deadlock.

198.     Mr. Schnapp properly triggered Section 6.5 by offering to either buy or sell his interest at $1.4 million and complied with all contractual requirements.

199.     Ms. Albert failed to respond with a conforming and timely acceptance and did not provide the required 10% deposit, and refused to execute closing documents in accordance with the Buy/Sell process. She is therefore deemed to have elected to sell her interest.

200.     Thereafter, Ms. Albert separately breached the Operating Agreement by: (a) failing to secure Mr. Schnapp's release from personal guarantees on Company leases; (b) conditioning performance on unrelated and extracontractual terms, including Mr. Schnapp's resignation from Silent Captain; (c) inserting new conditions and deadlines unilaterally; and (d) acting in bad faith throughout the closing process.

201.     Ms. Albert has also breached the Operating Agreement by making unilateral decisions for the Company.

202.     Every contract in New York contains an implied covenant of good faith and fair dealing.

203.     Ms. Albert breached this covenant by weaponizing the Buy/Sell process, misrepresenting material facts, threatening post-closing litigation, refusing to release known claims, and conditioning performance on new demands unrelated to the parties' agreement.

204.     Ms. Albert's conduct was designed to frustrate the purpose of the Buy/Sell provision and extract leverage from Mr. Schnapp, in direct violation of her contractual duties.

205.     As a direct result, Mr. Schnapp has suffered damages, including attorneys' fees, unreleased liabilities, business disruption, and reputational harm.

## THIRD COUNTERCLAIM

206.     Mr. Schnapp repeats and realleges each and every allegation above as if fully set forth herein.

207.     An actual and justiciable controversy exists between the parties regarding Ms. Albert's purported removal of Mr. Schnapp as a Manager of the Company.

208.     On March 13, 2025, Ms. Albert, through counsel, issued a letter purporting to remove Mr. Schnapp as a Manager of the Company, citing Section 6.11 of the Operating Agreement and alleging that he had ceased to be a Member by virtue of an estate-planning-related transfer.

209.     Section 9.1(b) of the Operating Agreement expressly permits each Member to transfer their economic interest in the Company to a trust or affiliate for estate planning purposes.

210.     The Operating Agreement does not authorize the removal of a Manager solely based on an estate-planning transfer of economic interest, particularly where the Member retains control and rescinds the transfer.

4898-4785-8513v.2

211.     Moreover, the transfer in question was promptly rescinded by Mr. Schnapp on the advice of counsel, thereby reaffirming his full status as both a Member and a Manager of the Company.

212.     Ms. Albert's assertion that the estate-planning transfer triggered a for "cause" removal under Section 6.11 is unfounded, contrary to the Operating Agreement's text and intent, and constitutes a pretextual effort to usurp governance control in violation of the Operating Agreement.

213.     Accordingly, Mr. Schnapp seeks a judicial declaration that:

- He remains a Member and Manager of Biscuits & Tangs, LLC;

- The March 13, 2025 notice of removal is null, void, and without legal effect;

- Any actions taken by Ms. Albert based on that purported removal—including but not limited to unilateral governance decisions—were unauthorized and invalid; and

- Mr. Schnapp must be restored to full access and authority in accordance with the Operating Agreement.

214.     Declaratory relief is necessary to preserve Mr. Schnapp's contractual rights, restore proper corporate governance, and prevent further irreparable harm to the Company and its stakeholders.

215.     These injuries cannot be fully remedied through money damages because the value of Mr. Schnapp's right to manage the Company, and the reputational and operational harm from his exclusion, are not readily quantifiable. Accordingly, injunctive and declaratory relief are warranted.

216.     In addition to injunctive relief, Mr. Schnapp reserves the right to seek immediate, interim relief in the form of a temporary restraining order or preliminary injunction to preserve the joint-management of the Company until pending final resolution.

4898-4785-8513v.2

**WHEREFORE**, Counterclaim-Plaintiff Jonathan Schnapp respectfully requests that the Court enter judgment in his favor and against Counterclaim-Defendant Ashley Albert as follows:

1.   On the First Counterclaim, ordering Ms. Albert to specifically perform her obligations under Section 6.5 of the Operating Agreement, including execution of all documents necessary to transfer her membership interest in the Company, and directing any other relief necessary to consummate the transaction;

2.   On the Second Counterclaim, awarding Mr. Schnapp compensatory damages in an amount to be determined at trial, including attorneys' fees, costs, unreleased liabilities, and other losses resulting from Ms. Albert's breach of the Operating Agreement;

3.   On the Third Counterclaim, declaring that Ms. Albert's March 13, 2025 attempt to remove Mr. Schnapp as Manager of Biscuits & Tangs, LLC was null and void, and that Mr. Schnapp remains a duly authorized Manager and Member of the Company;

4.   Attorneys' Fees pursuant to Section 6.5 (c) of the Operating Agreement; and

5.   For such other and further relief as this Court deems just and proper.

Dated: Great Neck, New York
          June 27, 2025

GARFUNKEL WILD, P.C.
*Attorneys for Defendant Jonathan Schnapp and*
*LAC Services I, Inc., as Trustee of the Schnapp*
*Family Business Trust*

By:   */s/ Mickey Keane*
          Michael J. Keane, Jr.
          Mickey Keane

111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200

4898-4785-8513v.2

To: KIRK & INGRAM, LLP
David E. Kirk
*Attorneys for Plaintiff*
43 West 43rd Street, Suite 279
New York, NY 10036
Telephone: (212) 859-3504
DKirk@kirkingram.com

## <u>VERIFICATION</u>

I, Jonathan Schnapp, am over the age of 18 and am the Defendant/Counterclaim Plaintiff in this action. I have reviewed the allegations of the Answer with Verified Counterclaims in this action and the documents annexed thereto, and attest that the allegations set forth in the Counterclaim are true and correct based on my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would do so competently. I declare under the penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Dated: June 27, 2025

_____
Jonathan Schnapp