# Exhibit 1

<u>**OPERATING AGREEMENT OF**</u>

<u>**BISCUITS AND TANGS, LLC**</u>


**OPERATING AGREEMENT** (this "Agreement") made as of the 5th day of January, 2016, by and between Ashley Albert, having an address at 575 Union Street, 2nd Floor, Brooklyn, New York 11215 and Jonathan Schnapp, having an address at 267 Carroll Street, Apt. #1, Brooklyn, New York 11231 (those certain individuals set forth on the Schedule A are hereinafter referred to individually as a "Member" and collectively as the "Members").

W I T N E S S E T H :

**WHEREAS**, Biscuits and Tangs, LLC (the "LLC" or the "Company") was formed as a New York limited liability company on May 23, 2012; and

**WHEREAS**, the Company is a member and the Manager of both (i) The Royal Palms Shuffleboard Club, LLC ("Royal Palms New York"), a New York limited liability company, pursuant to that certain Limited Liability Company Agreement, effective as of June 11, 2012 (the "NY RP Operating Agreement"), and (ii) Royal Palms Chicago LLC ("Royal Palms Chicago", together with Royal Palms New York, the "Royal Palms Shuffleboard Clubs" or the "Subsidiaries"), an Illinois limited liability company, pursuant to that certain Limited Liability Company Agreement, dated as of January 5, 2016 (the "Chicago RP Operating Agreement", together with the NY RP Operating Agreement, the "RP Operating Agreements"); and

**WHEREAS**, Royal Palms New York is the tenant pursuant to a certain lease for certain premises located at 514 Union Street, Brooklyn, New York (the "Royal Palms Brooklyn Location"), and Royal Palms Chicago is the tenant pursuant to a certain lease for certain premises located at 1760 North Milwaukee Avenue, Chicago, Illinois (the "Royal Palms Chicago Location", together with the Royal Palms Brooklyn Location, the "Royal Palms Locations"); and

**WHEREAS**, the Company, pursuant to the RP Operating Agreements, manages all of the business of the Royal Palms Shuffleboard Clubs; and

**WHEREAS**, the Members, through their membership herein, will each be members of the Company, and wish to set forth their respective rights and obligations to each other, and the Company.

**NOW, THEREFORE**, in consideration of the agreements and obligations set forth herein and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Members intending to be legally bound hereby agree as follows:

**ARTICLE I**
**DEFINED TERMS**

1.1     <u>Definitions.</u>   Unless the context otherwise requires, the terms defined in this Article I shall, for the purposes of this Agreement, have the meanings herein specified.

"Act" means the New York Limited Liability Company Law as amended from time to time.

"Agreement" means this Operating Agreement of the Company, as amended, modified, supplemented or restated in accordance with the terms hereof from time to time.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Paragraph 4.3 hereof.

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the agreed upon value of any property (other than money) contributed to the Company pursuant to Paragraph 4.1 hereof with respect to such Member's Interest, as shown on Schedule A annexed hereto.

"Certificate" means the Articles of Organization of the Company filed on behalf of the Company with the office of the Secretary of State of the State of New York pursuant to the laws of the State of New York.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific Section (§) of the Code refers not only to such specific Section but also to any corresponding provision of any federal tax statute enacted after the date of this Agreement, as such specific Section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"Fiscal Year" means (i) the period commencing upon the formation of the Company and ending on December 31, 2012, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (ii) of this sentence for which the Company is required to allocate Net Profits, Net Losses and other items of Company income, gain, loss or deduction pursuant to Article V hereof.

"Interest" means a Member's limited liability company interest in the Company which represents such Member's share of the profits and losses of the Company and a Member's right to receive distributions of the Company's assets in accordance with the provisions of this Agreement.

"Liquidation" means the earlier of: (i) the liquidation of a Member's Interest within the meaning of Treas. Reg. § 1.704-1(b)(2)(g); or, (ii) the sale or other taxable disposition of the Company's properties which causes the aggregate acquisition cost of all the Company's properties which have been sold or so disposed of to exceed 85% of the original acquisition cost of all of the Company's properties.

"Manager" or "Managers" means Ashley Albert and Jonathan Schnapp, each individually, as a Manager, or collectively, as the Managers of the Company, with the powers and obligations set forth in Article VI herein. The Managers shall be deemed Managing Members for purposes of this Agreement.

"Management Fee" means the fees payable to the Company as the manager of the Royal Palms Shuffleboard Clubs pursuant to Section 4.06(b) of the Chicago RP Operating Agreement and Section 4.06(b) of the NY RP Operating Agreement.

"Member Loan" means a loan to the Company by a Member in accordance with the provisions of this Agreement.

"Net Cash Flow" means, for each Fiscal Year of the Company, the gross cash receipts of the Company from all sources, other than Member Loans, less all amounts paid by or for the account of the Company during the same Fiscal Year or other period, including, without limitation, any amounts such as

gross receipts taxes, that are held by the Company as a collection agent or in trust for others or that are otherwise not unconditionally available to the Company, and payments of principal and interest on any Company indebtedness, other than Member Loans, the Management Fee and expenses reimbursed to the Members under Paragraph 7.2 hereof, and less any amounts determined by a Manager to be necessary to provide a reasonable reserve for working capital needs or any other contingencies of the Company or otherwise set aside for reduction of Company liabilities. Net Cash Flow shall be determined in accordance with the cash receipts and disbursements method of accounting and otherwise in accordance with generally accepted accounting principles consistently applied. Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, depletion, similar allowances or other non-cash items, but shall be increased by any reduction of reserves previously established and shall not be deemed to include Distribution Proceeds as defined in Paragraph 5.4 herein.

"Percentage Interest" means the Interest of a Member, expressed as a percentage of one hundred percent and is as set forth in Schedule A annexed hereto and made a part hereof.

"Person" includes any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"Net Profits" and "Net Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) of the Internal Revenue Code.

"Property" means certain real property and/or personal property leased, acquired or to be leased or acquired by the Company and all rights appertaining thereto.

"Schedule A" means the Schedule A entitled Schedule of Members annexed hereto and made a part hereof.

1.2    Headings.    The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

## ARTICLE II
## FORMATION AND TERM

2.1.    Name.    The name of the Company is Biscuits and Tangs, LLC. The Managers have caused to be filed with the Department of State of New York Articles of Organization for the LLC and shall hereafter satisfy all other requirements of the Act to conduct the business of the LLC in the State of New York.

2.2    Office.    The principal offices of the LLC are located at 575 Union Street, Brooklyn, New York, 11215, or such other place or places as the Managers shall determine.

2.3    Formation.    The Company was formed on May 23, 2012. On such date, the Members on Schedule A were admitted as Members of the Company.

2.4    Members.    There shall be one class of Members. The amounts contributed to the capital of the Company are listed on Schedule A. The Members shall be required to update Schedule A from time to time as necessary to accurately reflect the address information therein. Any amendment or revision to Schedule A made in accordance with this Paragraph shall not be deemed an amendment to this Agreement.

Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

2.5    <u>Term.</u>    The term of the LLC shall commence as of the filing of its Articles of Organization and shall continue until December 31, 2066, or until terminated as hereinafter provided.

**ARTICLE III**
**PURPOSE AND POWERS OF THE COMPANY**

3.1    <u>Purpose.</u>    The Company was formed to manage certain business interests and interests in the Royal Palms Shuffleboard Clubs.

3.2    <u>Business of the LLC.</u>    The business of the LLC shall be to manage the operations of the Royal Palms Shuffleboard Clubs, and to engage in any and all activities necessary, convenient, desirable or incidental to the foregoing.

3.3    <u>Powers of the LLC.</u>    Subject to the limitations of Paragraphs 3.1 and 3.2 above and Article VI below, the LLC shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes and business set forth in Paragraph 3.1 and 3.2 including, but not limited to the power:

(a)    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States that may be necessary, convenient or incidental to the accomplishment of the purposes of the LLC; and

(b)    to acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property and obtain loans secured by such real and personal property that may be necessary, convenient or incidental to the accomplishment of the purposes of the LLC; and

(c)    to enter into, perform and carry out contracts of any kind, necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes and business of the LLC including, without limitation, subject to Paragraph 6.2(e) hereof, contracts with Members or affiliates of any Member, or any agent of the Company; and

(d)    subject to Paragraph 6.2(e), to appoint employees and agents of the LLC, and define their duties and fix their compensation; and

(e)    subject to Paragraph 6.2(e), to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any lease, contract or security agreement in respect of any assets of the Company; and

(f)    subject to Paragraph 6.2(e), to borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge or other lien on the assets of the LLC; and

4

(g)    to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the LLC or the assets of the LLC or to hold such proceeds against the payment of contingent liabilities; and

(h)    to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the    purposes    and business of the Company; and

(i)    to engage in any other lawful act or activity in furtherance of the Company's purposes and business as the Managers shall determine; and

(j)    from time to time, to do any one or more of the things and acts set forth herein.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS, INTERESTS,
## CAPITAL ACCOUNTS AND ADVANCES

4.1    Capital Contributions.

(a)    The Members have made Capital Contributions to the capital of the Company and the Members hereby acknowledge and agree that such Capital Contributions shall be reflected on the books of the Company as set forth in Schedule A.

(b)    It is anticipated that no other funds shall be required by the Company.

(c)    In the event the Managers determine any additional working capital is required by the LLC, from time to time, in excess of the Capital Contributions, Members may, but are not required to, make a loan or loans (or cause an affiliate to make a loan or loans) to the LLC.  Any loan(s) made under this Paragraph 4.1(c) shall be at such times and in such amounts as the Managers and the lending Member shall determine (the "Member Loan(s)"), provided, however, all Member Loans shall be on "commercially reasonable" terms.   For the purposes of this Paragraph 4.1(c), the definition of "commercially reasonable" for Member Loans shall mean (i) a loan with a rate of interest up to but not in excess of eighteen (18%) percent per annum, and (ii) that such Member Loan, with interest accrued thereon, may be repaid out of Net Cash Flow prior to any distribution to the Members.

4.2    Member's Interest.  A Member's Interest in the LLC shall for all purposes be personal property.  A Member has no interest in specific LLC Property.

4.3    Individual Capital Account.  An individual capital account shall be maintained for each Member.  Each Member's capital account shall consist of its Capital Contribution as set forth in Paragraphs 4.1(a) and (b) hereof, increased by (i) such Member's additional contributions to the capital of the LLC, if any, and (ii) such Member's distributive share of the Net Profits of the LLC, and decreased by (i) distributions to such Member by the LLC, (ii) such Member's distributive share of Net Losses of the LLC, and (iii) such Member's distributive share of expenditures of the LLC not deductible in computing Net Profits or Net Losses and not properly treated as capital expenditures.

4.4    Repayment of Capital Contributions.  No Member shall have the right to withdraw, or demand a refund or return of all or any part of its Capital Contributions, or receive or demand property other than cash.   Reference is made to Paragraph 5.5 with respect to Member Loans. Capital

Contributions shall be repaid in accordance with the terms of Paragraphs 5.2 and 5.4, to the extent of Net Cash Flow.

4.5  <u>Treasury Regulation Section 1.704-l(b).</u>  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of capital accounts are intended to comply with Treas. Reg. Section 1.704-l(b), as amended, and shall be interpreted and applied in a manner consistent with such regulation, as amended. In the event the accountants for the LLC (the "Accountant") shall determine that it is prudent to modify the manner in which the capital accounts, or any debits or credits thereto, are computed in order to comply with such Regulation, such modification may be made, provided that it is not likely to have a material effect on the amounts distributable to any Member during any tax year or pursuant to Paragraphs 5.2 and 5.4 hereof upon the liquidation of the LLC. There shall be an adjustment to the amounts debited or credited to capital accounts with respect to (a) any property contributed to the LLC or distributed to a Member and (b) any liabilities that are secured by such contributed or distributed property or that are assumed by the LLC or the Member, in the event the Accountant shall determine such adjustments are necessary or appropriate pursuant to Treas. Reg. Section 1.704-l(b)(2)(iv).

**ARTICLE V**
**ALLOCATIONS AND DISTRIBUTIONS**

5.1  <u>Net Profits and Net Losses.</u>

5.1.1  Net Profits shall be allocated to the Members as follows:

(i)  First, to the Members, to the extent (and in the same proportion) as the aggregate Net Losses that have been allocated to the Members pursuant to Paragraph 5.1.2(ii); then to the Members, to the extent (and in the same proportion) of the aggregate Net Profits that have been allocated in prior years to the Members pursuant to Paragraph 5.1.2(ii). To the extent that allocations of Net Loss are offset pursuant to this Paragraph 5.1.1(i), such allocations shall be disregarded for purposes of computing subsequent allocations pursuant to paragraphs 5.1.1 and 5.1.2.

(ii)  Thereafter to the Members in proportion to their Percentage Interests.

5.1.2  Net Losses shall be allocated to the Members as follows:

(i)  First, to the extent that Net Profits have been allocated pursuant to Paragraph 5.1.1(ii), Net Losses shall be allocated to the Members to offset Net Profits allocated pursuant to Paragraph 5.1.1(ii) hereof. To the extent that allocations of Net Profits are offset pursuant to this Paragraph 5.1.2(i), such allocations shall be disregarded for purposes of computing subsequent allocations pursuant to Paragraphs 5.1.1 and 5.1.2.

(ii)  Second, to the Members in proportion to their unreturned Capital Contributions until such time as the balance of their Capital Accounts equal zero.

(iii)  Thereafter to the Members in accordance with their Percentage Interests.

5.1.3  For purposes of this Article V, Net Profits and Net Losses are defined to be, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable

income or loss). (Cross reference is made to Paragraph 4.4). Notwithstanding anything to the contrary herein, for purposes of computing Capital Accounts, the following adjustments shall be made to Net Profits and Net Losses:

(i)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(iii)   Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the gross asset value (its fair market value), of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its gross asset value; and

(iv)    Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Paragraph 5.3 hereof shall not be taken into account in computing Net Profits or Net Losses.

5.1.4   (i)     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial gross asset value computed in accordance with the terms set forth herein.

(ii)    In the event the gross asset value of any Company asset is adjusted in accordance with the terms set forth herein, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its gross asset value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(iii)   Allocations pursuant to this Paragraph 5.1.4 are solely for purposes of Federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's capital account.

5.2     Net Cash Flow shall be determined separately for each Fiscal Year of the Company and not cumulatively. Subject to Paragraph 5.4, the Net Cash Flow of the Company shall be distributed to the Members at such times as may be reasonably be determined by the Managers, but not less than annually, and in the following order and priority:

(i)     First, to the repayment of principal and interest due and owing on Member Loans;

(ii)    Second, to the Members in proportion to their unreturned Capital Contribution; and

(iii)    The remainder, pari passu to each Member in accordance with each Member's Percentage Interest.

5.3    In the event any Members unexpectedly receive any adjustments, allocations, or distributions described in Treas. Reg. Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-l(b)(2)(ii)(d)(5) or 1.704-l(b)(2)(ii)(d)(6), items of Company income and gain shall be  allocated among such Members in accordance with the Percentage Interests. Any special allocations  of items of income or gain pursuant to this Paragraph 5.3 shall be taken into account in computing subsequent allocations of profits pursuant to this Article 5, so that the net amount of any items so allocated and the profits, losses and all other items allocated to each Member pursuant to this Article 5 shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article 5 if such unexpected adjustments, allocations or distributions had not occurred. The Members intend to incorporate a "qualified income offset" as described in Section 1.704-l(b)(2)(ii)(d) of the Treasury Regulations which to the extent not covered is hereby incorporated by reference. Additionally, this Agreement incorporates by reference the "Minimum Gain Chargeback Requirement" of Section 1.704-2(f) of the Treasury Regulations.

Nonrecourse deductions, as defined in Section 1.704-2(b) and (c) of the Treasury Regulations, shall be allocated among the Members in accordance with their Percentage Interests.  Member nonrecourse deductions and chargeback of members nonrecourse debt minimum gain, as defined in Section 1.704-2(i) of the Treasury Regulations, shall be allocated to the Member who bears the economic risk of loss with respect to the Member nonrecourse debt (as defined in Section 1.704-2(b)(4) of the Treasury Regulations) to which such member nonrecourse deductions are attributable in accordance with Section 1.704-2(i) of the Treasury Regulations, unless required otherwise by Section 1.704-2 of the Treasury Regulations.

5.4    The net cash proceeds herein referred to as the "Distribution Proceeds" from the sale, refinancing, insurance proceeds and/or condemnation of any Company Property or any portion thereof or the liquidation of the Company following, or in connection with, a dissolution of the Company, which are not reinvested or retained by the Company for the continuation of the business thereof, shall be promptly distributed and applied in the following order of priority:

(a)    to pay any debts or liabilities of the Company (including any Member Loans);

(b)    to establish any reserves which the Managers deem reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company, provided, however, that at the expiration of such period of time as the Managers may deem advisable, the balance of such reserve remaining after the payment of such contingencies shall be distributed in the manner hereinafter set forth in this Paragraph 5.4;

(c)    then to the Members, pari passu, in accordance with their Percentage Interests.

5.5    <u>Member Loans to the Company</u>.  Each Member Loan made pursuant to Paragraphs 4.1(c) shall bear interest at the rate set forth in such loan.  Additionally, each Member Loan shall be a valid debt of the Company and shall be repaid in full together with the interest thereon before any distributions (whether from Net Cash Flow, Distribution Proceeds or otherwise) are made to any Member.  Any amounts available to repay any Member Loan shall be paid to the respective lenders in proportion to the outstanding amount of each such loan and all repayments shall be applied first to outstanding interest on such loans and then to the outstanding principal balance.

## ARTICLE VI
## MANAGEMENT

6.1     Management of the Company.  The Managers shall direct the management of the Company.  Unless specified herein to the contrary, each Manager shall have the full and exclusive right, power and authority to manage all of the affairs and business affairs of the Company and the Property with all the rights and powers generally conferred by law, or necessary, advisable or consistent in connection therewith.  The Managers shall be required to take such actions as are reasonably required to fulfill the business and purposes of the Company as set forth in Paragraphs 3.1 and 3.2 herein.  Each Manager shall devote such time and effort to the Company as may be reasonable and necessary to carry out its responsibilities.  No Member other than the Managers shall take any action on behalf of the Company.

6.2     Major Decisions.  Notwithstanding the provisions of Section 6.1 above, no Manager is authorized to perform or cause to be performed any of the following (each of the following, a "Major Decision") without the prior written consent of the other Manager (the "Non-Requesting Manager") (which can be via email):

(a)     modifying, amending, restating or revoking the Articles of Organization of the Company or this Agreement or the Articles of Organization or Operating Agreements of the Subsidiaries;

(b)     admitting any new Members to this Company or to any Subsidiary or issuing any new membership interests in this Company or in any Subsidiary;

(c)     making any purchase in excess of Five Thousand Dollars and 00/100 ($5,000.00) on behalf of the Company or any Subsidiary;

(d)      making any decisions concerning, or resolving any disputes with respect to, investors in the Company or the Subsidiaries;

(e)     contracting with any Member, affiliates of any Member, any member of any Member, or any affiliates of the foregoing for supplying services or for any other purpose (including employment by the Company); it being understood and agreed that the Managers shall not consent to any such contract unless it is on no less favorable terms to the Company than would exist in an arms length, bona fide third party contract, lease or agreement, as applicable;

(f)     making a Member Loan to the Company or any Subsidiary;

(g)     calling any capital with respect to the Company or any subsidiary;

(h)     making any distribution of funds from this Company or any Subsidiary except in strict compliance with the terms of this Agreement or the Operating Agreement for the Subsidiaries;

(i)     changing the principal office of the Company;

(j)     employing agents, attorneys, auditors, accountants and depositories;

(k)     permitting the Company or any Subsidiary to employ persons in the operation and management of the Company or any Subsidiary, or making any other personnel decisions with

respect to the Company or its Subsidiaries, including, without limitation, (i) whether to terminate or promote any employees, (ii) determining the compensation (including bonuses) of any employee, and (iii) establishing any policies or procedures regarding employees;

      (l)      permitting the Company to enter into any contract of insurance;

      (m)      selling, leasing or buying any real property;

      (n)      entering into any contract (or contracts with any single third party) for any sum in excess of Five Thousand Dollars and 00/100 ($5,000.00);

      (o)      merging or consolidating with any other entity;

      (p)      commencing any litigation or settling or confessing judgment;

      (q)      making any changes to the décor of any Royal Palms Shuffleboard Clubs or to the brand or logo of the Company or any subsidiary;

      (r)      borrowing money and mortgaging Company assets or property or Subsidiary assets or property; or

      (s)      making any sale, assignment, pledge, mortgage, transfer, hypothecation or exchange of an Interest, except as may be permitted by Article IX.

In the event the Non-Requesting Manager fails to respond to a request for consent to a Major Decision from the requesting Manager (the "Requesting Manager") within ten (10) days after the delivery of a written request for same (which can be via email to the address designated in Schedule A), then the Requesting Manager shall provide a second written request for same (the "Second Request"), which provides in bold and capital letters: "**SECOND NOTICE: MANAGER'S FAILURE TO RESPOND TO THIS NOTICE WITHIN TEN (10) DAYS SHALL BE DEEMED A CONSENT TO THE MAJOR DECISION DESCRIBED BELOW, THEREBY AUTHORIZING THE COMPANY TO PROCEED WITH SUCH MAJOR DECISION**." If the Requesting Manager gives a Second Request to the Non-Requesting Manager and the Non-Requesting Manager fails to respond within ten (10) days (which can be via email), then the Non-Requesting Manager shall be deemed to have consented to such Major Decision.

      6.3    <u>Company Legal Counsel.</u>  The Members herein acknowledge that Lester Bleckner & Shaw LLP has acted as legal counsel to the Company and may be engaged to represent the Company in any legal matters.

      6.4    <u>Limitations on Manager Powers</u>: Notwithstanding the foregoing set forth in Paragraph 6.2 hereof, no Manager may:

      (a)      do any act in contravention of this Agreement, the Certificate or any amendments thereto; or

      (b)      do any act which would make it impossible to carry on the ordinary business of the Company as provided in this Agreement;

6.5    Deadlock; Buy/Sell.  If the Managers reach an irreconcilable impasse (as determined by either Manager in good faith) with respect to a Major Decision, either party may, but shall not be obligated to, exercise the Buy/Sell Rights provided in this Paragraph 6.5.

(a)    At any time during the continuation of such irreconcilable impasse, a Managing Member ("Offeror") may make to the other Managing Member ("Offeree") an offer to sell Offeror's total Interest for the amount set forth pursuant to Paragraph 6.5(b); and such offer shall be coupled with an offer to purchase Offeree's total Interests for such amount (collectively, an "Offer to Sell or Purchase"). If both Managing Members have issued an Offer to Sell or Purchase in accordance with this Paragraph 6.5(a), then the Offer to Sell or Purchase reflecting the higher purchase price for all of the assets of the Company shall be the prevailing offer for purposes of this Paragraph 6.5.

(b)    The Offer to Sell or Purchase shall state the price to be paid for all assets of the Company.  The price to be paid to the selling Member for its total Interest shall equal the amount the selling Member would receive were all the Company's assets sold for the stated price, the Company immediately dissolved, all debts of the Company paid and its assets distributed in a hypothetical liquidation pursuant to the provisions of Paragraph 10.3 (such calculation shall take into consideration transfer taxes and prorations the Company would have incurred if it had consummated the sale pursuant to an asset purchase agreement but it shall not take into consideration the federal, state or local income tax effects to a Member).  The closing costs and expenses associated with the buy/sell transaction under this Paragraph 6.5 shall be paid by the Company.  The Managers agree that no brokers' commissions will be due in connection with any transaction hereunder.  The Offer to Sell or Purchase shall be irrevocable for a period of thirty (30) days from receipt by Offeree.

(c)    Offeree shall respond in writing to the Offer to Sell or Purchase within said thirty (30) day period (the "Offer Period") by accepting one of the offers (the "Response"), and if the Offeree elects to purchase, it shall deliver with such Response immediately available funds equal to ten percent (10%) of the purchase price as a non-refundable deposit (the "Deposit").  In the event the Offeree rejects the offer and elects not to Purchase ("Offeree Rejection"), or in the event the Offeree fails to make an election within the Offer Period, such Offeree shall be deemed to have elected to sell its Interest in the Company to the Offeror.  Closing of the transfer of the total Interest of either Offeror or Offeree (the "Buy/Sell Closing") in accordance with Offeree's election shall take place within sixty (60) days of receipt by Offeror of the Response (or the expiration of the Offer Period, if a deemed Response) or such earlier date as may be required by the purchasing Managing Member (the "Buy/Sell Closing Date").  The amount to be paid for the total Interest of the selling Managing Member shall be established as of the date of the Offer to Sell and Purchase.  Any disagreement with respect to the calculation of the amount to be paid in accordance with Paragraph 6.5(b) shall be referred to an independent accountant (the "Accountant") selected by mutual agreement of the Managers, and paid by the Offeror, whose decision shall be conclusive.  The Company's accountant shall be deemed to be mutually selected by the Managers as the Accountant for purposes of this Paragraph.

(d)    At the Buy/Sell Closing:

1.    any outstanding Member Loans made by the selling Member shall be immediately due and payable and shall be paid by the Company to the selling Member together with any interest accrued thereon;

2.    the purchasing Member shall pay to the selling Member the full amount of the purchase price (as determined pursuant to Paragraph 6.5(b)-(c)), less the Deposit, by wire

transfer of immediately available funds (in United States dollars) to such account(s) as designated by the selling Member); and

3.      the selling Member shall deliver to the purchasing Member an executed assignment of the selling Member's total Interest sufficient to convey such Interest to the purchasing Member free and clear of any liens or encumbrances.

(e)      Failure to Close.   If a Member fails to meet its obligations under Paragraph 6.5(d) on the Buy/Sell Closing Date, then such Member shall be in default ("Defaulting Member") and the other Member ("Nondefaulting Member") shall be entitled to the following rights and remedies, which shall be the only rights and remedies related to such default: (i) if the Defaulting Member is the selling Member, then the Nondefaulting Member shall be entitled to (A) seek actual damages for out-of-pocket, third party costs and expenses (including attorneys' fees but not including any punitive or speculative damages) from the Defaulting Member or (B) pursue the equitable remedy of specific performance and the Defaulting Member shall pay the attorneys' fees of the Nondefaulting Member; and (ii) if the Defaulting Member is the purchasing member, then the Nondefaulting Member shall be entitled to (A) retain the Deposit as liquidated damages, it being agreed that the amount of damages that will be suffered by the Nondefaulting Member will be significant but difficult to determine, or (B) pursue the equitable remedy of specific performance and the Defaulting Member shall pay the attorneys' fees of the Nondefaulting Member.

**IF THE FOREGOING INTEREST SALE FAILS TO CLOSE DUE TO THE OFFEREE'S DEFAULT, THE OFFEROR WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THOSE DAMAGES.   SUCH DAMAGES WILL, HOWEVER, BE EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN AND THE MEMBERS HEREBY DESIRE TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH THE OFFEROR MIGHT BE LIABLE SHOULD THE OFFEREE BECOME THE DEFAULTING MEMBER. THEREFORE, THE DEPOSIT AMOUNT SHALL BE DEEMED TO CONSTITUTE A REASONABLE AND FAIR ESTIMATE OF THE SELLING MEMBER'S DAMAGES IF THE FAILURE TO CLOSE RESULTS FROM OFFEROR'S DEFAULT; PROVIDED, HOWEVER, THAT THE MEMBERS AGREE THAT, IN NO EVENT SHALL THIS LIQUIDATED DAMAGES PROVISION APPLY TO ANY INDEMNITY PROVISIONS OF THIS AGREEMENT OR TO ANY ATTORNEYS' FEES INCURRED BY THE OFFEREE IN ENFORCING ITS RIGHTS HEREUNDER.**

6.6      Agency Relationship.   It is acknowledged that the Managers (but no other Members) are an agent of the LLC for the purpose of its business, and the acts of the Managers, including the execution in the name of the Company of any instrument, for apparently carrying on in the usual way the business of the LLC, binds the LLC, unless (i) such Manager has in fact no authority to act for the Company in the particular matter and (ii) the person with whom it is dealing has knowledge of the fact that the Manager has no such authority.

6.7      Liability of the Manager.   Except for any affirmative representations, warranties or covenants of the Manager contained in this Agreement,  Manager shall not be  liable, responsible or accountable in damages or otherwise to the Company or to any Member for any errors in judgment for any act, including any act of active negligence performed by such person or entity, or for any omission or failure to act, if the performance of such act or such omission or failure is done in good faith, is within the scope of the authority conferred upon such person or entity by this Agreement or by law and does not constitute breach of fiduciary duty, fraud, willful misconduct, gross negligence or reckless disregard of duties (a "Covered Act").  The doing of an act or the failure to do any act by a Manager, resulting in loss

or damage to the Company, if done pursuant to advice of legal counsel or accounting counsel employed by a Manager on behalf of the Company, shall not subject such Manager to any liability to the Members or to the Company and shall constitute a Covered Act.

6.8     Indemnity.  The LLC shall indemnify and hold harmless the Managers and all of the Members and their permitted successors and assigns (collectively the "Indemnified Persons") from and against any and all damages, losses or liabilities, cost or expense (including but not limited to reasonable attorneys' fees) reasonably incurred by any such Indemnified Persons in connection with the defense or disposition of any proceeding in which any such Indemnified Person may be involved or with which any such Indemnified Person may be threatened, with respect to or arising out of any act or failure to act which is a Covered Act.

6.9     Manager Compensation.  The Managers are not entitled to any fee for providing services as Managers, but shall be reimbursed for any ordinary and necessary out-of-pocket expenses incurred on behalf of the Company in accordance with Paragraph 7.2 hereof.  Notwithstanding the foregoing, each Manager shall be entitled to receive fifty percent (50%) of the Management Fee upon the Company's receipt of same from the Royal Palms Shuffleboard Clubs.  Payments of the Management Fee shall be treated for income tax purposes as guaranteed payments and deducted for purposes of calculating Net Profits or Net Losses under Article 5.  In the event (i) a Manager is removed in accordance with Paragraph 6.11 herein, or (ii) elects to no longer serve as a Manager of the Company, then such Manager shall no longer receive its share of the Management Fee.  A Manager's Interest as a Member of the Company, if any, shall not be affected by its decision not to serve as a Manager of the Company.

6.10     Deadlock Resolution.  If the Members reach an irreconcilable impasse (as determined by either Member in good faith) in respect to a Major Decision, then the provisions of this Paragraph 6.10 shall apply, provided that no Offer to Sell or Purchase pursuant to Paragraph 6.5 is currently outstanding.

(a)     At any time during the continuation of such irreconcilable impasse, either Member may issue a notice thereof to the other Member (a "Deadlock Notice").  The Deadlock Notice shall describe the irreconcilable impasse (the "Deadlock") and the resolution proposed by the Member issuing the Deadlock Notice.  If a Deadlock Notice is properly issued, the Members shall meet in good faith during the fifteen (15) Business Day period after the Deadlock Notice has been received (or such shorter period of time as shall reasonably be required under the circumstances then existing) to attempt to resolve in a reasonable manner the issue that is the subject of the Deadlock.  If the issue that is the subject of a Deadlock is not resolved by the Members within such fifteen (15) Business Day period, then such issue shall be decided by arbitration pursuant to Paragraph 6.10(b).

(b)     Arbitration shall be the exclusive method for resolution of any impasse that is not subject to a Buy/Sell pursuant to Paragraph 6.5, and the determination of the arbitrators shall be final and binding (except to the extent there exist grounds for vacation of an award under applicable arbitration statutes) on the Members.  The parties agree that they will give conclusive effect to the arbitrators' determination and award and that judgment thereon may be entered into in any court having jurisdiction.  The arbitrators will have no authority to award punitive damages or any other damages not measured by the prevailing party's actual damages.  Any party may make an application to the arbitrators seeking injunctive relief to maintain the status quo until such time as the arbitration award is rendered or the controversy is otherwise resolved.  Any party may apply to any court having jurisdiction hereof and seek injunctive relief in order to maintain the status quo until such time as the arbitration award is rendered or the controversy is otherwise resolved.  Each party shall bear its own costs in any arbitration;

provided, however, that the non-prevailing party, if any, in such arbitration (to be indicated by the arbitrators) shall solely bear the costs and fees of the arbitrators.

(c)     The number of arbitrators shall be three, each of whom shall be disinterested in the dispute or controversy and shall be impartial with respect to all parties hereto.  A member shall commence arbitration by serving a demand for arbitration on the other Members (the "Demand").  The initiating Member ("Claimant") shall appoint an arbitrator within ten (10) Business Days of the Demand. The respondent shall appoint an arbitrator within ten (10) Business Days of the appointment of an arbitrator by the Claimant.  The third arbitrator shall be appointed by both arbitrators within ten (10) Business Days of appointment of both arbitrators in accordance with the then prevailing Commercial Rules of the American Arbitration Association.  Should the services of an appointing authority be necessary, the appointing authority shall be the American Arbitration Association.

(d)     The place of arbitration shall be New York, New York.  The arbitrators shall give effect insofar as possible to the desire of the parties hereto that the dispute or controversy be resolved in accordance with good commercial practice.  The arbitrators shall decide such dispute in accordance with the law of the State of New York.  The arbitrators shall decide such dispute within thirty (30) days of selection of the third arbitrator.

(e)     In the event of any arbitration or other dispute arising as a result of or by reason of this Agreement, the prevailing party in any such litigation, arbitration or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorney fees, and all other costs and expenses incurred in connection with settling or resolving such dispute.  The attorneys' fees which the prevailing party is entitled to recover shall include fees for prosecuting or defending any appeal and shall be awarded for any supplemental proceedings until the final judgment is satisfied in full.  In addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit or arbitration procedure on this Agreement shall be entitled to its reasonable attorneys' fees incurred in any post judgment proceedings to collect or enforce the judgment.  This attorneys' fees provision is separate and several and shall survive the merger of the Agreement into any judgment.

6.11     Removal.     A Manager may be removed only for Cause.  "Cause" means: (i) conviction or plea of guilty or nolo contendere with respect to an act of fraud, embezzlement, theft or any other material violation of law by a Manager in connection with the operation of the Company or affecting the assets of the Company; (ii) a Manager's breach of Paragraph 7.4; (iii) a Manager ceasing to be a Member; or (iv) the death of a Manager.  In the event a Manager is (a) removed pursuant to this Paragraph, (b) withdraws from serving as a Manager of the Company, or (c) is no longer a Member of the Company, such Manager agrees that it shall not, whether in writing or orally, criticize, denigrate or disparage the Company, any Subsidiary or the other Manager with respect to any of the Company's, the Subsidiary's or such Manager's past or present activities, or otherwise publish, whether written or orally, statements that tend to portray the Company, its Subsidiaries or the other Manager in an unfavorable light, or which could affect adversely the conduct of the Company's or its Subsidiaries' business or its reputation or the conduct of business or the business or reputation of any of the Company's parents, subsidiaries or affiliates.

## ARTICLE VII
## MEMBERS

7.1  <u>Powers of Members.</u>  The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms or this Agreement.

7.2  <u>Reimbursements.</u>  The Company shall reimburse the Members and the Managers for all ordinary and necessary out-of-pocket expenses incurred by the Members and the Managers on behalf of the Company, provided a reasonable accounting hereof shall be provided on a quarterly basis to all of the Members.  Such reimbursement shall be treated as an expense of the Company that shall be deducted in computing the Net Cash Flow and shall not be deemed to constitute a distributive share of Net Profits or a distribution or return of capital to any Member.

7.3  <u>Partition.</u>  Each Member waives any and all rights that it may have to maintain an action for partition of the Company's property.

7.4  <u>Other Activities of Members; Restrictive Covenants.</u>

(a)  Subject to Paragraph 7.4(b), any Member, Manager or their affiliates may engage in business ventures and investments, other than in connection with the Company, of any nature whatsoever, provided, however, that each Member shall have the affirmative obligation to present, disclose and make available to the other Member and the Company each and every shuffleboard-related business opportunity, enterprise, project or establishment of which such Member becomes aware, prior to pursing such opportunity outside of the Company.  Notwithstanding the foregoing, neither the Company nor any of the other Members shall have any right to or interest in any other business venture or investment in which a Member, Manager or their affiliates may engage hereunder, or to share in any income, profit or other benefit derived therefrom, solely by virtue of this Agreement.

(b)  Notwithstanding anything in this Agreement to the contrary, no Member or Manager shall engage in any Competitive Business (as defined herein), or perform any service, directly or indirectly, in or for a Competitive Business, or have any interest, whether as proprietor, partner, executive, stockholder, principal, agent, consultant, director, officer or in any other capacity or manner whatsoever, in any Competitive Business.  This non-compete shall apply during such time that the Member or Manager is serving in its respective position, and shall continue for four (4) years from the date on which such Member or Manager is no longer a Member or Manager, respectively, of the Company.  A "Competitive Business" means any shuffleboard-related business, enterprise, project or establishment in the United States.  Each Member acknowledges that the restriction contained in this Paragraph is reasonable and necessary for the protection of the immediate interests of the Company in that any violation of these restrictions would cause substantial injury to the Company.  If any Member or Manager violates or threatens to violate any of the foregoing restriction, the Company shall be entitled to preliminary and permanent injunctive relief (without the necessity of posting a bond or other security) in addition to any other remedy which may be available.  If a court or arbitrator determines that the duration or geographic limitations of any restriction contained herein is unenforceable, it is the intention of the parties that the restrictions set forth herein shall be deemed amended to the extent required to make them valid and enforceable.

# ARTICLE VIII
# BOOKS AND RECORDS

8.1     <u>Financial Statements.</u>     The fiscal year of the LLC shall be the calendar year.  Proper accounting records of all LLC business shall be kept and shall remain open to inspection of any of the Members, or their designees or legal representatives, at all reasonable times.  At the end of each calendar year, a complete accounting of the affairs of the LLC shall be furnished to each Member, together with such appropriate information as may be required by each Member for the purpose of preparing his or her income tax return for that year. All matters of accounting for which there is no provision in this Agreement are to be governed by generally accepted principles of accounting applied on a consistent basis.  The books and records of the LLC shall be kept at the principal place or business of the LLC, or in such other place as designated by the Manager.

In the event of (i) a transfer of any interest in the LLC, the non-transferring Manager(s) shall in its sole discretion have the right, or (ii) any other circumstance in which an election under Section 754 of the Internal Revenue Code, as amended, may be appropriate, the Managers in their sole discretion shall have the right, to cause the LLC to make the election permitted by Section 754 of the Internal Revenue Code, as amended, provided that such election shall be allowable at the time and provided further there is no detriment to the other Members.

8.2     <u>Confidentiality.</u>

(a)     Each Member hereby acknowledges that it may have access to Confidential Information regarding the operations of the Company or the other Members, and agrees that it shall hold and maintain such Confidential Information as strictly confidential and shall not disclose it to any third party, except to carry out its responsibilities to the Company, and not to use such Confidential Information in a way which is detrimental to the Company or to any other Member.  Each Member further expressly acknowledges and confirms that any Confidential Information shall be considered and shall remain a trade secret.

(b)     <u>Definition of Confidential Information</u>. The term "Confidential Information" shall mean all information, whether written or oral, which may be disclosed or made available by the Company to a Member, including, but not limited to:

(i) financial, commercial or other information which relates to the current or proposed business, financial affairs, methods of operation, accounts, products, transactions, techniques or systems of the Company, its affiliates, its customers or its vendors;

(ii) information or data relating to the Company's business plans, systems, operations, policies, procedures, or personnel; and

(iii) all data, notes, summaries or other material derived from the information specified in (i) and (ii) above.

(c)     <u>Exclusion from Confidential Information</u>. "Confidential Information" shall not mean any information that:

(i) becomes generally available to the public other than as a result of a disclosure in violation of this Agreement; or

(ii) was or becomes available to a Member on a non-confidential basis from a source other than the Company, which source is entitled, to the best of Member's knowledge, to make the disclosure.

(d)　　**Injunctive Relief**. The Members and the Company agree that should either one threaten to breach or breach any provision of this Paragraph, the non-breaching party will suffer irreparable damages and its remedy at law will be inadequate. Therefore, the non-breaching party is entitled, in addition to all other remedies available to it at law or in equity, to seek equitable relief, including specific performance and injunctive relief, to enforce any provision hereof and to restrain the breaching party from using or disclosing any confidential information. The breaching party shall be liable for all reasonable costs, expenses and fees (including court costs and reasonable attorneys' fees) incurred by the non-breaching party in successfully seeking to enforce this Agreement.

(e)　　**Mandatory Disclosures**. If any Member is requested by subpoena, civil investigative demand or similar process, to disclose any Confidential Information, such Member shall provide the Company with prompt notice of such request(s), so that the Company may seek an appropriate protective order and/or waive such Member's compliance with the provisions of this Agreement. If Member is, in the opinion of Member's counsel, compelled to disclose Confidential Information, Member may disclose such information without liability hereunder.

(f)　　The confidentiality provisions of this Paragraph 8.2 shall apply to each Member for a period of two (2) years from the effective date of the termination of such Member's status as a Member in the Company.

## ARTICLE IX
## TRANSFER OF MEMBER'S INTERESTS

9.1　　Transfer of Member's Interest.

(a)　　Except as otherwise provided in Paragraphs 9.1(b), (c) and (d), no Member shall, without the written consent of the other Member, sell, assign, transfer, mortgage or otherwise encumber his, her or its interest in this LLC or in the Member's assets or enter into any agreement of any kind that would result in any person, firm or corporation becoming interested with him, her or it in the LLC, and no Member will permit any of its equity holders (i.e., its shareholder, partners, members, etc.) to sell, assign, transfer, mortgage or otherwise encumber his, her or its interest in the Member. Any sale, assignment, pledge, mortgage, transfer, hypothecation or exchange of an Interest in violation of this Article IX shall be void *ab initio* and shall not bind the Company.

(b)　　Notwithstanding anything to the contrary herein, a Member may, without the written consent of the other Member, transfer its Interest in the LLC to an immediate family member, one or more trusts for estate planning purposes, or an Affiliate, provided such Member controls such Affiliate. "Affiliate" means, with respect to the entity or person in question, any other person that, directly or indirectly: (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such entity; or (ii) controls, is controlled by, or is under common control with, the entity in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies, or general conduct of business of the entity in question, whether by ownership of voting securities, contract, or otherwise. No Interest transferred pursuant to this Section 9.1(b) or transferred pursuant to operation of law, or inherited, shall carry with it any voting rights or entitle any transferee thereof to be a Manager of the Company.

(c)     Right of First Offer.

(i) If a Member (the "ROFO Member") wishes to sell all or part of its Membership Interest (the "Offered Interest") in the Company, the ROFO Member must first send the other Member (the "ROFO Offeree") a written notice containing a buy-out offer, which includes the proposed purchase price for the Interests (the "Buy-Out Offer"). The ROFO Offeree shall have thirty (30) days ("ROFO Response Period") to accept the Buy-Out Offer in writing.

(ii) Upon the exercise of any option to purchase as set forth above, the ROFR Offeree shall purchase the Offered Interest within sixty (60) days after notifying the ROFO Member of the intent to exercise the option to purchase. If no option to purchase is exercised, or if no purchase is consummated within sixty (60) days following acceptance of the offer as specified herein, the ROFO Member shall be free to sell the Offered Interest at a price that is equal to or greater than the price set forth in the Buy-Out Offer. If the ROFO Member reduces the purchase price below the price in the Buy-Out Offer, or the Offered Interest is not sold within one hundred eighty (180) days following (x) the last date of the ROFO Response Period (if the ROFO Offeree did not respond to the Buy-Out Offer or elected not to purchase the Offered Interest), or (y) sixty (60) days following the acceptance of the offer (if the ROFO Offeree does not consummate the purchase), then the ROFO Member cannot otherwise sell the Offered Interest without again complying with the provisions of this Paragraph.

(iii)  In the event the ROFO Member sells its Interest to a third-party ("ROFO Purchaser"), ROFO Purchaser must provide such representations and warranties and execute such documentation as the Manager may reasonably require.  ROFO Purchaser shall not have a right to vote on any actions or otherwise participate in the business, management or affairs of the Company as a Member or Manager, but instead shall be entitled to receive only the share of Net Profits or Net Losses, distributions and the return of contributions relating to the Interests held by the ROFO Purchaser.

(d)     Right of First Refusal.  If a Member desires to sell its Interest, such Member (the "ROFR Member") shall submit a bona fide written offer from an unrelated third party to purchase all of its interest in the LLC ("Member Purchase Offer") to the other Member, and such other Member shall, within thirty (30) calendar days after delivery of such written notice of the Member Purchase Offer, shall, in writing and in accordance with Article XI herein, either (x) consent to the sale, (y) reject the sale pursuant to Section 9.1 hereof, or if there is no written response to the Member Purchase Offer within such thirty (30) day period there shall be an implied consent, provided the ROFR Member has sent a second notice in accordance with the provisions of Section 6.2 hereof, or (z) that Member which desires to do so shall give notice to the ROFR Member of such Member's agreement to acquire such ROFR Member's Interest in the Company at the price and on the terms equal to the Member Purchase Offer.

## ARTICLE X
## DISSOLUTION, LIQUIDATION AND TERMINATION

10.1    Events Causing Dissolution.  Upon the first to occur of the following events, the LLC shall be dissolved and its affairs wound up:

(a)  the resignation, expulsion, death, bankruptcy or dissolution of a Member, or any occurrence which terminates the Member's membership in the LLC, except where within 180 days after

any such event the remaining Members, other than the affected Member (the "Affected Member"), vote to continue the business of the LLC;

        (b)  the sale or transfer of substantially all of the assets of the LLC;

        (c)  the LLC ceases its business operations;

        (d)  all the Members unanimously vote to dissolve and terminate;

        (e)  the entry of a decree of judicial dissolution; or

        (f)  as otherwise provided in the Articles of Organization.

10.2    Notwithstanding Paragraph 10.1, upon the occurrence of an event set forth in Paragraph 10.1(a), and in the event of an unanimous vote of the remaining Members to continue the business of the LLC under Paragraph 10.1(a) such vote shall also be deemed to be an authorization for the Affected Member's personal representative, executor, administrator or successor in interest to have all of the rights of a Member for the purpose of managing or settling his estate, and to have the right to transfer the Affected Member's Interest in accordance with the Affected Member's Last Will and Testament, if one exists, and if not, then in accordance with applicable law.

10.3    <u>Liquidation.</u>  Upon dissolution of the LLC, the business and affairs of the LLC shall continue to be governed by this Agreement during the winding up of the LLC's business and affairs.  The Managers shall carry out the winding up of the Company and shall immediately commence to wind up the Company's affairs, provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation. The Members shall continue to share Net Profits and Net Losses during liquidation in the same proportions, as specified in this Agreement, as before liquidation. The proceeds of liquidation shall be distributed in accordance with Paragraph 5.4.

10.4    <u>Termination.</u>  The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article X and the Certificate shall have been canceled in the manner required by the LLCL.

10.5    <u>Claims of the Members.</u>  The Members and former Members shall look solely to the LLC's assets for the return of their Capital Contributions and if the assets of the LLC remaining after payment of or due provision for all debts, liabilities and obligations of the LLC are insufficient to return such Capital Contributions and the Members and former Members shall have no recourse against the LLC or any other Member or any Manager.

**ARTICLE XI**
**NOTICES**

11.1    Any notice required or given with respect to this Agreement shall be valid and effective when delivered by registered or certified mail or reputable overnight courier or by hand to the address hereinabove set forth.  Any notice provided hereunder to be given to or received by a Member shall be given by or to the legal representative of any Member who is deceased. Any party hereto may change such address by notice given to the LLC and the other Members in accordance with this Article.

# ARTICLE XII
## REPRESENTATIONS AND WARRANTIES

12.1 Each Member hereby represents and warrants to each other Member as follows:

(i) It has the power and authority to enter into and perform this Agreement, and the execution, delivery and performance of this Agreement by such Member has been duly authorized.

(ii) No consent of any third party is required in connection with the execution, delivery or performance of this Agreement by such Member.

(iii) There are no actions, suits or proceedings, pending or, to the best of its knowledge, threatened against or affecting such Member (or its constituents) in any court of law or in equity or before any governmental entity that might affect the ability of such Member to perform its obligations under this Agreement.

(iv) The execution, delivery and performance of this Agreement will not violate any agreement to which it is a party or by which it is bound.

# ARTICLE XIII
## MISCELLANEOUS

13.1 This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. Any party that receives an assignment of the interest of a Member in accordance with the terms hereof shall be required to execute and deliver to each other Member a legally enforceable agreement expressly assuming all of the terms, conditions and covenants of this Agreement and such other documents as the Manager shall reasonably require prior to such assignment becoming effective.

13.2 This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed wholly in such State.

13.3 This Agreement sets forth the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior and contemporaneous agreements, arrangements and understandings relating to the subject matter hereof.

13.4 This Agreement may be amended or modified only by a written instrument executed by all Members. The failure of a party at any time or times to require performance of any provisions hereof shall in no manner affect the party's right at a later time to enforce the same. No waiver by any party of the breach of any term contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or of the breach of any other term of this Agreement.

13.5 Reference to this Agreement herein shall include any amendment or renewal hereof.

13.6 If any provision of this Agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and only to the extent such provision shall be held to be invalid or unenforceable and shall not in any way affect the validity or enforceability of the other provisions hereof, all of which provisions are hereby declared severable, and this Agreement

shall be carried out as if such invalid or unenforceable provision or portion thereof was not embodied herein.

13.7    This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement. Facsimile, .pdf and photocopy signatures on this Agreement shall have the same force and effect as originals.

13.8    None of the provisions of this Agreement shall be for the benefit of or be enforceable by any creditors of the LLC or any other third party.

13.9    Words and phrases used herein in singular shall be deemed to include the plural and vice versa, and nouns and pronouns used in any particular gender shall be deemed to include any other gender, unless the context requires otherwise.

[Signatures on following page]

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

MEMBERS OF THE COMPANY:

_____
Jonathan Schnapp

_____
Ashley Albert

## SCHEDULE A

### SCHEDULE OF MEMBERS

| MEMBER | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| Jonathan Schnapp (jonathan@royalpalmsshuffle.com) | $400,000 | 50.00% |
| Ashley Albert (ashley@royalpalmsshuffle.com) | $400,000 | 50.00% |